RWS/vm (281-50240)

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

THE KLEINFELD LAW FIRM, P.A.

CASE NO.: 05-08314 CA 23

     Plaintiff,

vs.

SERGIO A. PAGLIERY, and GRAND PRIX
TITLE SERVICES, LLC,

     Defendants

_____/

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, The Kleinfeld Law Firm, P.A.., and sues the Defendant, Sergio A. Pagliery, individually, and alleges:

1.     This is an action for damages in excess of $15,000.00, exclusive of costs and interest, and is within the subject matter jurisdiction of this Court.

2.     Plaintiff, The Kleinfeld Law Firm, P.A., (hereinafter "Law Firm") is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

3.     Defendant, Sergio A. Pagliery, (hereinafter "Pagliery") is and was at all times material to this action a resident of Miami-Dade County, Florida, and sui juris.

4.     Defendant, Grand Prix Title Services, LLC, (hereinafter "Grand Prix") was at all times material to this action a Florida Limited Liability Company.

5.     Venue lies in this county because the claims asserted by Plaintiff arise from events or omissions occurring in Miami-Dade County, Florida.

6.     At all times material hereto Pagliery was an employee of the Law Firm.

7.     In his capacity as an employee of the Law Firm, Pagliery received instructions to set up a limited liability company named Grand Prix Title Services, LLC.

8.      Pagliery filed the documents required to set up Grand Prix; however, Pagliery named himself as manager of Grand Prix and, without consent or authorization, issued all units to himself.

9.      The Law Firm paid the costs of setting up Grand Prix and of operating the same on a day-to-day basis, including the rental of office space and payment of its employees.

10.     Pagliery left the Law Firm's employment on or about January, 2005.

11.     At the time Pagliery left the Law Firm's employ he took, without permission or authorization, client files of the Law Firm, bank accounts, records, and checks pertaining to Grand Prix, and other items that are the property of the Law Firm and/or Grand Prix.

12.     Upon information and belief, Grand Prix had bank accounts with deposits of approximately $140,000.00 at the time Pagliery left the Law Firm.

13.     The Law Firm made demand for the return of all Grand Prix materials and checks, and all other property of the Law Firm and/or Grand Prix, including its client files.

14.     Pagliery has failed to return the Law Firm's property within thirty (30) days.

15.     The Law Firm has retained legal counsel to bring this action and has incurred legal fees.

### COUNT I
### Civil Theft Under F.S. §772.11 and 812.005 et seq.

16.     The Law Firm re-alleges the allegations in paragraphs one through fourteen.

17.     This is an action for statutory damages for civil theft against Pagliery.

18.     Section 812.014(1), Florida Statutes, prohibits any person from knowingly obtaining, using or endeavoring to obtain or use the property of another with intent to deprive the owner of a right to use the property or a benefit therefrom, or to appropriate the property to his own use, or to the use of any person not entitled thereto.

19.     Pagliery wrongfully and knowingly obtained, used, or endeavored to use money and property of the Law Firm for his own use, which actions constitute civil theft as defined by Section 812.014 of the Florida Statutes, for which a remedy is provided in Section 812.034, Florida Statutes.

20.     The Law Firm made a written demand for the return of its property in accordance with Section 772.11, Florida Statutes. Pagliery has failed and refused to return the property as requested.

21.     Pursuant to the Civil Theft Statute, Section 772.11, the Law Firm is entitled to recover treble damages from Pagliery.

22.     The Law Firm has suffered damages as a result of Pagliery's actions and continues to be deprived of its rightful property.

WHEREFORE the Law Firm demands judgment against Pagliery for all of the statutory remedies available under §772.11 and §812.034, Florida Statutes, including compensatory damages, treble damages, interests, costs, attorneys' fees, and any other relief the Court deems just and proper.

## COUNT II
### Conversion

23.     The Law Firm re-alleges the allegations in paragraphs one through fourteen.

24.     This is an action for conversion against Pagliery.

25.     On or about January, 2005, Pagliery removed from the Law Firm's premises and converted to his own use property of the Law Firm, including bank accounts, checks and records of Grand Prix, client files of Plaintiff, and other property belonging to the Law Firm and/or Grand Prix, without the Law Firm's knowledge or authorization, including approximately $140,000.00 funds on deposit.

26.    Pagliery's removal of such property has deprived the Law Firm of its property permanently or for an indefinite period of time.

27.    Pagliery's acts were committed with a conscious disregard of the rights of the Law Firm, and with the wilful and wanton intent to deprive the Law Firm of its property.

28.    The Law Firm has made demand for the return of its property, but Pagliery has failed and refused to do so.

29.    As a result of Pagliery's acts, the Law Firm has suffered damages and suffered the loss of the use and benefit of the monies and property converted by Pagliery.

WHEREFORE the Law Firm demands judgment for damages against Pagliery plus interest, costs, and any other relief the Court deems equitable and just.

## COUNT III
### Breach of Duty of Loyalty and Good Faith

30.    The Law Firm re-alleges the allegations in paragraphs one through fourteen.

31.    As the Law Firm's employee, Pagliery owed the Law Firm a duty of loyalty and good faith.

32.    Pagliery breached his duties of loyalty and good faith by making himself manager and, without authorization, sole owner of Grand Prix, while all expenses of Grand Prix were paid by the Law Firm.

33.    Pagliery further breached his duties of good faith and loyalty by, without authorization, appropriating funds, records and accounts of Grand Prix, client files belonging to the Law Firm, and other property belonging to either the Law Firm or Grand Prix.

34.    As a result of Pagliery's actions the Law Firm has suffered damages.

WHEREFORE Plaintiff demands judgment for damages against Pagliery plus interest, costs, and any other relief the Court deems equitable and just.

## COUNT IV
### For Restoration of Converted Assets and Appointment of Receiver

35.     The Law Firm re-alleges the allegations in paragraphs one through fourteen.

36.     This is an action to set aside a transfer of corporate assets from Grand Prix and to appoint a receiver for the corporation.

37.     At all times mentioned, Pagliery was the member manager of Grand Prix.

38.     The Law Firm has a claim as a member of Grand Prix.

39.     In January, 2005, following a demand by the Law Firm to issue certificates to the Law Firm evidencing its ownership of Grand Prix, Pagliery made a distribution of $99,700.00 either to himself or to another entity solely controlled by him.

40.     The distribution was a violation of law, the articles of organization and operating agreement of Grand Prix, and a breach of the trust reposed in Pagliery by the Law Firm.

41.     The distribution was made to divest Grand Prix of assets, and to transfer the assets to Pagliery to carry on business under another name, for the purpose of rendering the Law Firm's interest in Grand Prix valueless.

WHEREFORE the Law Firm requests the Court as follows:

a.      That the distribution made by Grand Prix to Pagliery and/or to an entity controlled by him, be set aside.

b.      That a receiver of the property of Grand Prix be appointed.

c.      That Pagliery be directed to turn over to the receiver the property of Grand Prix, or account for its full value, and that the receiver hold this property or its money equivalent to the benefit of Grand Prix and its owners and creditors.

d.      That the Law Firm be awarded reasonable expenses for maintaining this action, including reasonable attorney's fees and costs.

e.    That this Court grant the Law Firm such further and other relief the Court deems equitable and just.

## COUNT V
### Money Lent

Pleading in the alternative, the Law Firm states:

42.    The Law Firm re-alleges the allegations in paragraphs one through seven.

43.    Pagliery filed the documents required to set up Grand Prix and named himself as manager of Grand Prix. Pagliery further issued shares in Grand Prix naming himself as the owner.

44.    Pagliery requested that the Law Firm pay the costs of setting up Grand Prix and of operating the same on a day-to-day basis, including the rental of office space and payment of its employees.

45.    The Law Firm provided all the funds to set up and operate Grand Prix pursuant to Pagliery's request.

46.    Pagliery and Grand Prix promised to repay the Law Firm for the funds advanced, but have failed and refused to do so, despite the Law Firm's demand.

47.    Pagliery and Grand Prix owe Plaintiff sums in excess of this Court's minimum jurisdictional amount together with interest due on the money lent to Pagliery and/or Grand Prix by Plaintiff between August of 2003 and January of 2005.

WHEREFORE the Law Firm demands judgment for damages against Pagliery and Grand Prix plus interest, costs, and any other relief the Court deems equitable and just.

## COUNT VI
### Unjust Enrichment

48.    The Law Firm re-alleges the allegations in paragraphs forty-two through forty-seven.

49.    If Pagliery and Grand Prix are allowed to retain all the funds expended by the Law Firm in the creation and operation of Grand Prix, and the monies on deposit with the bank at the time of the Pagliery's departure from the Plaintiff's firm, Pagliery and Grand Prix will be unjustly enriched at the Law Firm's expense.

WHEREFORE the Law Firm demands that a constructive trust be adjudged in an amount equal to the funds expended by the Law Firm, including funds on deposit, plus interest, and that a Final Judgment be entered requiring Pagliery and Grand Prix to pay such sums plus interest, the costs of this action, and to grant any other relief the Court deems equitable and just.

## COUNT VI
### Injury to Business Relations and Loss of Accounts

50.    The Law Firm re-alleges the allegations in paragraphs one through three, and five through six.

51.    During the period of his employment with the Law Firm Pagliery negligently and/or intentionally recorded his billable time so that the Law Firm's clients were either over-billed or were billed for work which was actually not performed by Pagliery.

52.    Pagliery knew or should have known that the time being charged to the Law Firm's clients was inflated and did so without regard to ethical considerations or possible injury to the Law Firm in its business relations.

53.    As a result of Pagliery's actions, the Law Firm had to adjust the client billings and lost the revenues associated with it.    Additionally, the Law Firm lost business relationships which also caused a loss of income for the firm.

WHEREFORE the Law Firm demands judgment against Pagliery for damages including compensatory damages, interests, costs, attorneys' fees, and any other relief the Court deems just and proper.

I HEREBY CERTIFY that a true copy of the foregoing was mailed this ___31st___ day of May, 2006 to:

     Sergio E. Pagliery, Esq., Shook, Hardy & Bacon, LLP, Attorneys for Defendant, Miami Center – Suite 2400, 201 S. Biscayne Boulevard, Miami, Florida 33131

                                HOMER BONNER
                                Co-counsel for Plaintiff
                                The Four Seasons Tower
                                1441 Brickell Avenue, Suite 1200
                                Miami, Florida  33131
                                Tel. (305) 350-5192
                                Fax.(305) 982-0069
                                    and
                                RALPH W. SYMONS, P.A.
                                Co-counsel for Plaintiff
                                2575 South Bayshore Drive, Suite 3A
                                Miami, Florida 33133
                                Tel. (305) 858-2000
                                Fax.(305) 858-1667

                            BY:_____
                                  RALPH W. SYMONS, ESQ.
                                Florida Bar No. 356816

# SERGIO A. PAGLIERY, P.A.
*Attorney At Law*

10691 N. Kendall Drive
Suite 310
Miami, Florida 33176

Telephone 305-275-8550
Facsimile 305-275-8553

Via Facsimile (305) 358-6541

March 29, 2000

Denis A. Kleinfeld, Esq.
The Kleinfeld Law Firm
One S.E. 3rd Avenue
Suite 1940
Miami, FL 33131

Dear Denis,

The following, which incorporates all prior notes, comments, and discussions, shall be our agreement.

1.    Sergio's job description:

Subject to Mr. Kleinfeld's overall review, Sergio's primary duty is to be responsible for the production and completion of work brought in to The Kleinfeld Law Firm (Firm) in a timely and efficient manner. This involves the day-to-day legal work and routine client dealings. The underlying philosophy is to allow Denis to pursue marketing, obtain clients, and develop overall client planning, with Sergio being responsible for the implementation and satisfactory completion of that planning. There shall be no client work on Denis' desk except in limited circumstances pre-approved by Denis.

2.    Compensation:

For the first four 4 months of employment, namely, April, May, June and July, 2000, Sergio's base salary shall be at the rate of $85,000.00 per year. From August, 2000 through and including March 31, 2001, Sergio's base salary shall be at the rate of $100,000.00 per year. Commencing April 1st, 2001, and every April 1st thereafter throughout the term of the agreement, Sergio shall receive a salary increase of at least 5% of his annual base salary for the preceding twelve month period.

1

3.      Annual Incentive Bonus:

During the term of this agreement Sergio will receive an annual incentive bonus provided the following criteria are met on an calendar year basis:

a.      attainment of standard working year hourly goals[1];

b.      an increase in the firm's base gross revenue[2] by twice the amount of Sergio's base salary in the preceding calendar year; and

c.      satisfactory fulfillment of the duties corresponding to the job description.

For example, if in the year 2000:

I.      Sergio attains the working year goals based on the schedules below; and

II.     Sergio satisfactorily fulfills the duties in the job description; and

III.    the firm's gross revenue in 1999 was 758,000.; and

IV.     in year 2000 Sergio's (pro rated) salary is approximately 70,000.; and

V.      the firm's gross revenue for the year 2000 reaches or exceeds the sum of 898,000.;

then the incentive bonus schedule stated below will be applicable and a bonus shall be paid to Sergio.   Further, in year 2001 Sergio's salary will be 103,749.99, therefore, the incentive bonus schedule will be applicable if the firm's gross revenue for the year 2001 reaches the total sum of 965,499.98.  This sum was obtained by adding the firm's base gross revenue (of 758,000.) plus two times Sergio's salary (207,499.98).  In the event an incentive bonus is earned based on the foregoing criteria, the bonus shall be paid within 30 days after the close of the preceding calendar year.

A standard working year shall be based on 1,824 working hours per year[3]; this equates to 1,368 working hours from April 1, 2000 through December 31, 2000.  The annual incentive bonus for attainment of the standard working year hourly goals, the increase in the firm's base gross revenue (of two times Sergio's salary), and fulfillment of the job description, will be based on the following schedules:

---

1.      The "standard working year" is 1,824 working hours per year.

2.      The firm's gross revenue for 1999 is represented to be 758,000, which amount shall be the firm's base gross revenue.  During the years 2000 through and including 2003, the firm's base gross revenue upon which to calculate the incentive bonus shall also be 758,000.  During the years 2004 through and including 2006, the base firm gross revenue shall be the actual firm gross revenue of 2003.  During the years 2007 through and including 2010, the base firm gross revenue shall be the actual firm gross revenue of 2006.

3.      "Working hours" shall include billable and non-billable time on client matters, administrative time on Firm matters, and administrative time for continuing legal education seminars or similar educational venues.

For the remainder of this year (April, 2000 through and including December, 2000):

    A.     From 1369 to 1409 hours - 1% of the Firm's gross revenue[4];
    B.     From 1410 to 1450 hours – 2% of the Firm's gross revenue;
    C.     From 1451 to 1490 hours – 3% of the Firm's gross revenue;
    D.     From 1491 to 1530 hours – 4% of the Firm's gross revenue;
    E.     Over 1530 hours – 5% of the Firm's gross revenue.

Beginning in the year 2001 and every other year thereafter throughout the term of the agreement, the hourly goals for the incentive bonus shall be calculated on a full calendar year – 1,824 working hours – and the percentage of the Firm's gross revenue payable as an incentive bonus shall be increased by .5% from the previous year's rate at each hourly goal stage. Thus, the schedule for the year 2001 and 2002 would be:

    A.     From 1825 to 1864 hours – 1.5% of the Firm's gross revenue;
    B.     From 1865 to 1904 hours – 2.5% of the Firm's gross revenue;
    C.     From 1905 to 1944 hours - 3.5% of the Firm's gross revenue;
    D.     From 1945 to 1984 hours – 4.5% of the Firm's gross revenue;
    E.     Over 1985 hours and over – 5.5% of the Firm's gross revenue.

In year 2003 and 2004 the incentive bonus schedule will be as follows:

    A.     From 1825 to 1864 hours – 2.0% of the Firm's gross revenue;
    B.     From 1865 to 1904 hours – 3.0% of the Firm's gross revenue;
    C.     From 1905 to 1944 hours – 4.0% of the Firm's gross revenue;
    D.     From 1945 to 1984 hours – 5.0% of the Firm's gross revenue;
    E.     Over 1985 hours and over – 6.0% of the Firm's gross revenue.

4.    Referral Fees:

All work brought in by Sergio because of his joining the firm shall be allocated as follows:

    A.    All fees earned by Sergio for legal work performed by him on or before March 31st, 2000, shall be retained by him and shall not be subject to offset regardless of when such fees are actually paid and received. Sergio represents that his accounts receivables are in excess of $30,000.00 for the work done by him or to be done by him on or before March 31, 2000.

    B.    Work done or brought in by Sergio after April 1st, 2000, shall be billed and collected by the Firm and shall be included in the Firm's gross revenue and shall be subject to the annual incentive bonus schedules described above.

---

4.    "Gross revenue" shall mean the total receipts of the Firm before deductions for any purpose.

SERGIO A. PAGLIERY, P.A.

C.      In the event the Firm, in its sole discretion, pays to Sergio a referral fee for work brought in to the firm by Sergio, the amount so paid will be reduced from the firm's base gross revenue for the year in which the annual incentive bonus is being determined.

5.      Benefits:

A.      Sergio will receive a maximum of three weeks paid vacation in each of the years 2000 through and including 2004. Thereafter, Sergio will receive a maximum of four weeks paid vacation per calendar year. Time spent at a CLE seminars or similar educational venues shall be not counted as vacation time.

B.      The Firm shall provide medical insurance for Sergio, his wife, and his three children.

C.      The Firm shall pay the following professional expenses on Sergio's behalf:

  I.      Annual Florida Bar dues;
  II.     Professional liability/malpractice insurance;
  III.    Annual Banker's Club dues;
  IV.     In October 2000, the tuition and airfare for his attendance at The Buckley School of Public Speaking, Advanced Seminar;
  V.      Parking expenses;
  VI.     Continuing Legal Education Seminars to meet the minimum reporting requirements of the Florida Bar;
  VII.    Cellular telephone services.

D.      The Firm shall reimburse Sergio for expenditures made by him for business purposes and business entertainment. Any single expenditure in excess of $500.00 shall be approved by Denis before the expense is incurred.

E.      If at any time during the first six months of calendar year 2003 the Firm is leasing or reimbursing Denis for the lease of a luxury vehicle for Mr. Kleinfeld, then in August, 2003 the Firm will lease or reimburse Sergio for the lease of a luxury vehicle of Sergio's choosing for a period of three years. In August 2006 and every three years thereafter, and provided the Firm is leasing or reimbursing Denis for the lease of a vehicle, Sergio shall be entitled to exchange the vehicle for a newer or different model. In the application of this paragraph, the reimbursement to Sergio shall not be in an amount greater than the amounts reimbursed to Denis.

F.      Commencing in January 2002, and every two year period thereafter, the Firm will pay the tuition for Sergio's attendance at the University of Miami's Heckerling Institute on Estate Planning.

G.      The Firm shall reimburse Sergio for sums (fees and costs) already paid or to be paid to Mrs. Patricia Etkin, Esq., in defense of the Florida Bar complaint filed by Mrs. Brinkmeyer against him. To this extent it is acknowledged that Sergio has already retained Mrs. Etkin and has paid to her a $2000.00 retainer. The Firm shall reimburse Sergio for this retainer no later than May

15th, 2000, and shall also reimburse (or pay on his behalf) the sums (fees and costs) paid or to be paid to Mrs. Etkin within thirty days after written notice by Sergio to the Firm that a payment to Mrs. Etkin has been made.

6.      Upon execution of this agreement by the parties hereto, the Firm shall pay to Sergio's P.A. the sum of 7,000., and on or before May 1st, 2000, a second sum of 7,000, (for a total sum of $14,000.).  The Firm shall report these payments on a 1099-Miscellaneous to Sergio's P.A. for calendar year 2000.

In return Sergio will liquidate and otherwise satisfy the following obligations:

A.      1 year's rent at Kendall location (9,000.00)
B.      Martindale-Hubbell Web-site (1,310.00)
C.      Aspen Publishers (426.00)
D.      Tax Analysts Cd-Rom Discs one-year w/ updates (199.00)

In addition, Sergio will assign his ownership of the following items to the Firm:

A.      One Hewlett Packard Pavillion CPU, one Hewlett Packard M70 Video Screen with accompanying keyboard & mouse, with a cost basis of 1,448.00;
B.      One Hewlett Packard LaserJet 4 printer with a cost basis of 1,355.00;
C.      Display Systems Probate Software with a cost basis of 735.00;
D.      The following publications:
        I.      Trusts & Estates
        II.     Hispanic Magazine
        III.    Latin Business
        IV.     Practical Tax Lawyer
        V.      Multinational & Multistate Planning text
        VI.     Administration of Trusts in Florida
        VII.    Restatement of the Law on Trusts (by Bogert)

7.      This agreement shall be for an initial term of one year, and it shall be renewed automatically each and every year thereafter for a successive term of one year, unless the agreement shall be terminated, amended, or otherwise modified in writing by agreement of the parties hereto.

Very truly yours,

SERGIO A. PAGLIERY

Approved and accepted on this  29  day of  MARCH , 2000.

Denis A. Kleinfeld

5
SERGIO A. PAGLIERY, P.A.

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION
CASE NO.:  05-08314 CA 23

THE KLEINFELD LAW FIRM, P.A.,

    Plaintiff,

vs.

SERGIO A. PAGLIERY, individually,

    Defendant.

———————————————————/

THE ORIGINAL
FILED ON:

MAR 15 2007

IN THE OFFICE OF
CIRCUIT COURT DADE CO. FL.

SERGIO A. PAGLIERY, individually, and
GRAND PRIX TITLE SERVICES, L.L.C.,
a Florida Limited Liability Company,

    Counterclaimants,

v.

THE KLEINFELD LAW FIRM, P.A.

    Counter-Defendant.

———————————————————/

## AMENDED COUNT VII
### (Tortious Interference with Contractual or Business Relationships)

Plaintiff, THE KLEINFELD LAW FIRM, P.A. ("Kleinfeld") realleges each and every allegation contained in Paragraphs 1, 2, 3, 5, 6, 10, 11, 13, 14, 15, 19, 20, 25 and 29 and further alleges as follows:

    1.    Plaintiff Kleinfeld entered into various contractual and business relationships with its clients for the rendition of legal and other professional services.

    2.    The Defendant, Pagliery, had knowledge of these relationships.



{00214524.DOC;1}
FERRELL

CASE NO.: 05-08314 CA 23

3.      Without justification, the Defendant Pagliery interfered and damaged the relationships by either negligently and/or intentionally recording his billable times so that the law firm's client's were either overbilled or were billed for work which was actually not performed by Defendant Pagliery.

4.      Defendant Pagliery knew or should have known that the time being charged to the law firm's clients was inflated and did so without regard to ethical considerations or possible injury to the law firm and its business relations.  In fact, Defendant Pagliery undertook such actions in an effort to harm the Plaintiff's profitable business relationships.

5.      As a direct and proximate result of Defendant Pagliery's actions, Plaintiff, Kleinfeld, has lost clients and revenue as the Plaintiff Kleinfeld was required to adjust client billings, to write off the time fraudulently entered by Defendant Pagliery.

6.      As a direct and proximate result of Defendant Pagliery's actions, the Plaintiff Kleinfeld lost business relationships and loss of income.

7.      Plaintiff moves to proffer evidence of punitive damages due to the conduct of the Defendant herein and will move the Court at the appropriate time to seek punitive damages as a result of the conduct of the Defendant Pagliery herein.

**WHEREFORE**, Plaintiff, THE KLEINFELD LAW FIRM, P.A., demands judgment against Defendant Pagliery for damages, including compensatory damages, interest, costs, and any other relief that this Court deems proper.


FERRELL

CASE NO.:  05-08314 CA 23

FERRELL LAW, P.A.
Counsel for *The Kleinfeld Law Firm, P.A.*
201 South Biscayne Blvd., 34th Floor
Miami, FL 33131
Telephone: (305) 371-8585
Facsimile: (305) 371-5732

By: _____
        Alan K. Fertel
        Fla. Bar No. 435066

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. Mail on this 15th day of March, 2007 upon Christopher King, Esq., Homer & Bonner, 1441 Brickell Avenue, Suite 1200, Miami, FL 33131, Ralph W. Symons, Esq., Ralph W. Symons, P.A., 2575 South Bayshore Drive, Suite 3A, Miami, FL 33133 and Evan Roberts, Esquire and Sergio E. Pagliery, Esquire, Shook, Hardy & Bacon LLP, 201 South Biscayne Boulevard, Suite 2400, Miami, FL 33131.

By: _____
        Alan K. Fertel



{00214524.DOC;1}3

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:   **0 7 - 1 3 9 37 CA 1 3**

POINT ONE, LLC,

       Plaintiff,

v.

CHEEKIE INVESTMENTS, LLC,
and SERGIO A. PAGLIERY, individually
and as Manager of Cheekie Investments, LLC.

       Defendants.

_____/



FILED

MAY 10 2007

HARVEY RUVIN
CLERK, CIRCUIT & COUNTY COURTS

## POINT ONE, LLC'S, VERIFIED EMERGENCY MOTION TO APPOINT RECEIVER OR IN THE LESSER ALTERNATIVE TO PLACE MONEY RECEIVED BY CHEEKIE INVESTMENTS, LLC, IN THE COURT REGISTRY

Plaintiff, POINT ONE, LLC, by and through undersigned counsel, respectfully moves this Honorable Court for the entry of an order appointing a Receiver to retain and oversee the orderly final distribution of the Oceania Cruises investment, and the winding down of CHEEKIE INVESTMENTS, LLC.  In the lesser alternative POINT ONE, LLC moves this Honorable Court for an Order requiring the Defendant, SERGIO A. PAGLIERY, to place all funds received by CHEEKIE INVESTMENTS, LLC, in the court registry for distribution pursuant to the Operating Agreement.

In support of this motion, Plaintiff states as follows:

1.      Cheekie Investments, LLC ("Cheekie" or the "Company") is a Florida limited liability company with its principal place of business located at 8788 S.W. 8th Street, Miami Florida 33174.

2.      Cheekie is a single-purpose LLC organized for the sole purpose of investing in Oceania Cruises and thereafter receiving and distributing funds from its investment.

3.      On December 19, 2002, Sergio A. Pagliery as attorney for Cheekie held the Initial Organizational Meeting of Cheekie, and Sergio A. Pagliery ("Pagliery") was appointed sole Manager.   In addition, Pagliery executed the Operating Agreement (the "Agreement"), as Manager and on behalf of the members of the Company.[1]

4.      Point One, LLC ("Point One"), is a Delaware limited liability company, and a member of Cheekie.  Point One made a $75,000 capital contribution in exchange for a 30% interest in Cheekie.

5.      Paragraph 4.1 of the Agreement, provides that Point One is entitled to distributions in proportion to its 30% interest.

6.      Upon information and belief, on or about April 27, 2007, Cheekie received a distribution of $2,616,498.01 from its investment in Oceania Cruises.  The exact amount of the distribution is unknown because Point One has not received an accounting from Cheekie.

7.      In that regard, on Tuesday, May 1, 2007, undersigned counsel requested an accounting from Pagliery's attorney.[2]  Further, undersigned counsel made repeated demands that Cheekie distribute the funds by wire to Point One.  Despite these requests, Cheekie has neither provided an accounting nor distributed the funds to Point One.

8.      Paragraph 5.1(i) of the Agreement requires Pagliery, as the sole Manager of the Company, to "perform his duties as a Manager in good faith, in a manner he reasonably believes

---

[1] For the court's convenience, the Agreement is attached hereto as Exhibit A.
[2] For the court's convenience, a copy of the email dated, May 1, 2007 is attached hereto as Exhibit B.

2

to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances."

9. Pagliery is currently a defendant in another action in which he faces several counts including civil theft, conversion, breach of duty of loyalty and good faith, unjust enrichment and tortious interference with contractual or business relationships. *The Kleinfeld Law Firm v. Sergio A. Pagliery et. al.*, 05–08314 CA 23.[3]

10. In particular, Pagliery was an employee of the Kleinfeld Law Firm (the "Firm") who was asked to organize a limited liability company on behalf of the firm, Grand Prix Title Services, LLC (the "Grand Prix").

11. Without consent, Pagliery named himself sole manager of Grand Prix. Subsequently, Pagliery left the firm, taking with him (again without consent) client files, bank accounts, records and checks pertaining to Grand Prix.

12. In addition, Pagliery stole approximately $140,000 from Grand Prix's bank accounts.

13. Similar to Cheekie, and despite repeated requests, Pagliery has failed to return the property belonging to the Firm and to Grand Prix.

14. Based on his past behavior, Pagliery, as sole Manager of the Company, cannot be entrusted with the fiduciary responsibility to retain or distribute any monies received by Cheekie or to handle the winding down of Cheekie.

15. Instead, a Receiver should be appointed to retain and oversee the orderly distribution of the funds received in accordance with the Agreement, as well as the winding

---

[3] For the court's convenience, a copy of the second amended complaint with the amended Count VII is attached as Exhibit C.

3

down of Cheekie.  In the lesser alternative, the money should be deposited in the Court Registry until distributions come due.

16.     In *Puma Enterprises Corp. v. Vitale*, 566 So. 2d 1343, 1344 (Fla. 3d DCA 1990), it was held that trial court did not abuse its discretion in appointing a receiver necessary to protect partnership assets. *See Kosow v. Kovens*, 473 So. 2d 776 (Fla. 3d DCA 1985)(finding no error in the trial court's appointment of a receiver to preserve the single asset of a partnership); Key *Caisee Corp. v. Seashore Shell Co.*, 470 So. 2d 792 (Fla. 3d DCA 1985)(affirming trial courts appointment of a receiver to facilitate the accomplishment of the purposes of a partnership).

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter an Order appointing a Receiver or in the lesser alternative an Order requiring Sergio A. Pagliery to place all monies received by Cheekie in the court registry.

4

I understand that I am swearing or affirming under oath to the truthfulness of the claims made herein and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

Point One, DLC

Dated: 5/8/07

By: _____
Manager

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was sworn to and signed before me this __8__ day of May, 2007 by _DENIS KLEINFELD_ [name], _MANAGER_ [title] of Point One, LLC, who is personally known to me and/or produced _____ identification.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC, STATE OF FLORIDA
_KARLEEN FOSTER_
Printed name of Notary Public

My Commission Expires:
Dated:


Karleen Foster
My Commission DD224097
Expires July 15, 2007

5

FERRELL LAW, P.A.
*Attorneys for Point One, LLC*
201 South Biscayne Boulevard
34th Floor, Miami Center
Miami, FL 33131
(305) 371-8585

By: _____
Alan K. Fertel
Florida Bar No. 435066

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. Mail on this 10th day of May, 2007 upon Christopher King, Esq., Homer & Bonner, 1441 Brickell Avenue, Suite 1200, Miami, FL  33131, Ralph W. Symons, Esq., Ralph W. Symons, P.A., 2575 South Bayshore Drive, Suite 3A, Miami, FL  33133 and Evan Roberts, Esquire and Sergio E. Pagliery, Esquire, Shook, Hardy & Bacon LLP, 201 South Biscayne Boulevard, Suite 2400, Miami, FL  33131.

By: _____
Alan K. Fertel

TO REORDER CALL 954-846-9399



RECYCLED PAPER



# OPERATING AGREEMENT

## OF

## CHEEKIE INVESTMENTS, LLC

This OPERATING AGREEMENT is entered into and shall be effective as of the 19th day of December 2002, by and between the Persons who are identified as Members on Exhibit A attached hereto and who have hereby become Members of this Company pursuant to the provisions of the Act and this Agreement, on the following terms and conditions:

### SECTION 1 - THE COMPANY

1.1 Formation. The Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement. The fact that the Certificate is on file in the office of the Secretary of State of Florida, shall constitute notice that the Company is a limited liability company. Simultaneously with the execution of this Agreement and the formation of the Company, which has as of the date hereof been accomplished, each of the Members shall be admitted as members of the Company. The rights and liabilities of the Members shall be as provided under the Act, the Certificate and this Operating Agreement.

1.2 Name. The name of the Company shall be **CHEEKIE INVESTMENTS, LLC**, and all business of the Company shall be conducted in such name. The Manager may change the name of the Company upon ten (10) Business Days notice all of the Members of the company.

1.3 Purpose; Powers. (a) The purposes of the Company are (i) to operate the Business, (ii) to make such additional investments and engage in such additional activities as the Members may approve and (iii) to engage in any and all activities related or incidental to the purposes set forth in clauses (i) and (ii).

(b) The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 1.3 hereof and has, without limitation, any and all powers that may be exercised on behalf of the Company by the Management Committee pursuant to Section 5 hereof.

1.4 Principal Place of Business. The principal place of business of the Company shall be at 8788 SW 8th Street, Miami, Florida. The Manager may change the principal place of business of the Company to any other place within or without the State of Florida upon ten (10) Business Days notice to the Members. The registered office of the Company in the State of Florida initially is located at 3732 N.W. 16th Street, Ft. Lauderdale, Florida.

1.5 Term. The term of the Company shall commence on the date the certificate of formation of the Company as such term is described in the Act (the "Certificate") is filed in the

office of the Secretary of State of the State of Florida in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 12 hereof. Prior to the time that the Certificate is filed, no Person shall represent to third parties the existence of the Company or hold himself out as a Member or Manager.

1.6 Filings; Agent for Service of Process. (a) The Managers are hereby authorized to and shall cause the Certificate to be filed in the office of the Secretary of State of the State of Florida in accordance with the Act. The Management Committee shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Florida, including the preparation and filing of such amendments to the Certificate and such other assumed name certificates, documents, instruments and publications as may be required by law, including, without limitation, action to reflect:

(i) a change in the Company name;

(ii) a correction of false or erroneous statements in the Certificate or the desire of the Members to make a change in any statement therein in order that it shall accurately represent the agreement among the Members; or

(iii) a change in the time for dissolution of the Company as stated in the Certificate and in this Agreement.

(b) The Members and the Management Committee shall execute and cause to be filed original or amended certificates and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any other jurisdictions in which the Company engages in business.

(c) The registered agent for service of process on the Company in the State of Florida shall be FILINGS, INC., or any successor as appointed by the Members in accordance with the Act.

(d) Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with Section 12, the Management Committee shall promptly execute and cause to be filed a certificate of cancellation in accordance with the Act and the laws of any other jurisdictions in which the Management Committee deems such filing necessary or advisable.

1.7 Title to Property. All Property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in its individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times after the Effective Date, the Company shall hold title to all of its Property in the name of the Company and not in the name of any Member.

1.8 Payments of Individual Obligations. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

1.9 Independent Activities; Transactions with Affiliates. (a) Each Manager shall be required to devote such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that such Manager may deem appropriate in his, her or its discretion.

(b) In so far as permitted by applicable law, neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or Manager or their Affiliates from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or Manager to permit the Company or any other Manager or Member or its Affiliates to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Member, each Member hereby waives, relinquishes, and renounces any such right or claim of participation.

(c) To the extent permitted by applicable law and subject to the provisions of this Agreement, the Management Committee is hereby authorized to cause the Company to purchase Property from, sell Property to or otherwise deal with any Member or Manager, acting on its own behalf, or any Affiliate of any Member or Manager; provided that any such purchase, sale or other transaction shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase or other transaction had been made with an independent third party.

1.10 Definitions. Capitalized words and phrases used in this Agreement have the following meanings:

"Accepting Offerees" shall have the meaning set forth in Section 10.4(d) hereof.

"Act" means the Florida Limited Liability Company Act, as amended from time to time (or any corresponding provisions of succeeding law).

"Additional Capital Contributions" means, with respect to each Member, the Capital Contributions made by such Member pursuant to Section 2.3 hereof. In the event Units are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Additional Capital Contributions of the transferor to the extent they relate to the Transferred Units.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Adverse Act" means, with respect to any Member, any of the following:

(i) A failure of such Member to make any Capital Contribution required pursuant to any provision of this Agreement;

(ii) A determination that such Member has committed a material breach of any material covenant contained in this Agreement or materially defaulted on any material obligation provided for in this Agreement and such breach or default continues for thirty (30) days after the date written notice thereof has been given to such Member by any other Member, provided that, if such breach or default is not a failure to pay money and is of such a nature that it cannot reasonably be cured within such thirty (30) day period, but is curable and such Member in good faith begins efforts to cure it within such thirty (3) day period and continues diligently to do so, such Member shall have a reasonable additional period thereafter to effect the cure (which shall not exceed an additional ninety (90) days unless otherwise approved by the Management Committee), and provided further that, if within thirty (30) days after written notice of such breach or default has been given to such Member, such Member delivers written notice (the "Contest Notice") to each other Member that it contests such notice of breach or default, such breach or default shall not constitute an Adverse Act unless and until (and assuming that such breach or default has not theretofore been cured in full and that any applicable grace period has expired) there is a Final Determination that such Member's actions or failures to act constituted such a breach or default;

(iii) A Transfer of all or any portion of such Member's Interest except as expressly permitted or required by this Agreement;

(iv) Any dissolution or liquidation of a Member or the taking of any action by its directors, majority stockholder, or Parent looking to the dissolution or liquidation of such Member, unless substantially all assets of the Member are transferred or are to be transferred to a Wholly Owned Affiliate of such Member;

(v) The Bankruptcy of such Member or the occurrence of any other event which would permit a trustee or receiver to acquire control of the affairs or assets of such Member;

(vi) A failure of such Member's Parent to continue to have direct or indirect control of such Member for any reason; or

(vii)  A Change of Control of the Parent of any Member.

An "Adverse Member" is any Member with respect to whom an Adverse Act has occurred.

"Affiliate" means, with respect to any Person (i) any Person directly or indirectly controlling, controlled by or under common control with such Person (ii) any officer, director, general Member, member or trustee of such Person or (iii) any Person who is an officer, director, general Member, member or trustee of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general Members, or persons exercising similar authority with respect to such Person or entities.

"Agreement" or "Operating Agreement" means this Operating Agreement of **CHEEKIE INVESTMENTS, LLC,** including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"Allocation Year" means (i) the period commencing on the Effective Date and ending on December 31, 2002, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31 or (iii) any portion of the period described in clauses (i) or (ii) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Section 3 hereof.

"Appraisers' Notice" shall have the meaning set forth in Section 11.4 hereof.

"Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person (i) the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors, (ii) the filing of any petition or answer by such Person seeking to adjudicate itself as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its Property or (iii) corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or without the

consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the Property of such Person which order shall not be dismissed within ninety (90) days.

"Business" means the business of operating, managing, licensing, franchising and/or developing any commercial or industrial dealings, trade, enterprise, establishment or business or other gainful activity which can, in the opinion of the Manager or the Managing Member (as the case may be) be advantageously carried on and to do such other things as are incidental, necessary or desirable in order to accomplish the foregoing.

"Business Day" means a day of the year on which banks are not required or authorized to close in Miami, Florida.

"Buy-Sell Price" shall have the meaning set forth in Section 11.1(c) hereof.

"Capital Account" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(i)  To each Member's Capital Account there shall be credited (A) such Member's Capital Contributions, (B) such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 3.3 or Section 3.4 hereof, and (C) the amount of any Company liabilities assumed by such Member or which are secured by any Property distributed to such Member.  The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or a Member related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2);

(ii)  To each Member's Capital Account there shall be debited (A) the amount of money and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement, (B) such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 3.3 or Section 3.4 hereof, and (C) the amount of any liabilities of such Member assumed by the Company or which are secured by any Property contributed by such Member to the Company;

(iii)  In the event Units are Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Units; and

(iv)  In determining the amount of any liability for purposes of subparagraphs (i) and (ii) above there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Management Committee shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Members, are computed in order to comply with such Regulations, the Management Committee may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Section 12 hereof upon the dissolution of the Company. The Management Committee also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

"Capital Contributions" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any Property (other than money) contributed to the Company with respect to the Units in the Company held or purchased by such Member, including Additional Capital Contributions.

"Certificate" means the certificate of formation filed with the Secretary of State of the State of Florida pursuant to the Act to form the Company, as originally executed and amended, modified, supplemented or restated from time to time, as the context requires.

"Certificate of Cancellation" means a certificate filed in accordance with the Act.

"Change of Control" of any Parent means that a Person (together with any Affiliates of such Person or Persons otherwise associated with such Person) or a "group" within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), is or becomes the beneficial owner (as defined under Rule 13d of the 1934 Act), directly or indirectly, of shares of stock of such Parent entitling such Person to exercise twenty percent (20%) or more of the total voting power of all classes of stock of such Parent entitled to vote in elections of directors; provided, however, that a Change of Control shall not be deemed to have occurred if such event shall have been approved by a majority of the Continuing Directors of such Parent. "Continuing Director" means (i) any member of the board of directors of such Parent who is not an Affiliate of or otherwise associated with an Acquiring Person and who was a member of the board of directors prior to the time the Acquiring Person became an Acquiring Person, and (ii) any Person who is not an Affiliate of or otherwise associated with an Acquiring Person and who is recommended to succeed a Continuing Director by a majority of Continuing Directors. An "Acquiring Person" means any Person (together with any Affiliate or Person otherwise associated with such Person) who is or becomes the beneficial owner, directly or indirectly, of shares of stock of such Parent entitling such Person to exercise more than ten percent (10%) of the total voting power of all classes of stock of such Parent entitled to vote in elections of directors. A "Change of Control" shall be deemed to have occurred if, during any period of up to twenty-four (24) consecutive months commencing after the Effective Date, Persons who at the

7

beginning of such period constituted such Parent's board of directors or whose nomination for election by such Parent's shareholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved shall cease for any reason to constitute a majority of the board of directors then in office.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed pursuant to this Agreement and the Certificate and the limited liability company continuing the business of this Company in the event of dissolution of the Company as herein provided.

"Contest Notice" has the meaning set forth in clause (ii) of the definition of "Adverse Act."

"Debt" means (i) any indebtedness for borrowed money or the deferred purchase price of property as evidenced by a note, bonds, or other instruments, (ii) obligations as lessee under capital leases, (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien or charge of any kind existing on any asset owned or held by the Company whether or not the Company has assumed or become liable for the obligations secured thereby, (iv) any obligation under any interest rate swap agreement, (v) accounts payable and (vi) obligations under direct or indirect guarantees of (including obligations (contingent or otherwise) to assure a creditor against loss in respect of) indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii), (iv) and (v), above provided that Debt shall not include obligations in respect of any accounts payable that are incurred in the ordinary course of the Company's business and are not delinquent or are being contested in good faith by appropriate proceedings.

"Depreciation" means, for each allocation Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Management Committee.

"Dissolution Event" shall have the meaning set forth in Section 12.1 hereof.

"Effective Date" means the date hereof.

"Electing Members" shall have the meaning set forth in Section 11.1 hereof.

"Election Day" shall have the meaning set forth in Section 11.1(b) hereof.

"Election Notices" shall have the meaning set forth in Section 11.1 hereof.

"Final Determination" means (i) a determination set forth in a binding settlement agreement between the Company and the Member alleged to have committed an Adverse Act, which settlement agreement has been approved by the Management Committee, or (ii) a final judicial determination, not subject to further appeal, by a court of competent jurisdiction.

"Firm Offer" shall have the meaning set forth in Section 10.4(b) hereof.

"First Appraiser" shall have the meaning set forth in Section 11.4 hereof.

"Fiscal Quarter" means (i) the period commencing on the Effective Date and ending on April 1, 2000, (ii) any subsequent three-month period commencing on each of July 1, October 1, January 1 and April 1 and ending on the last date before the next such date and (iii) the period commencing on the immediately preceding January 1, April 1, July 1, or October 1, as the case may be, and ending on the date on which all Property is distributed to the Members pursuant to Section 11 hereof.

"Fiscal Year" means (i) the period commencing on the Effective Date and ending on [insert day after the last day of the Company's taxable year], (ii) any subsequent twelve-month period commencing on January 1, and ending on December 31, and (iii) the period commencing on the immediately preceding January 1, and ending on the date on which all Property is distributed to the Members pursuant to Section 13 hereof.

"GAAP" means generally accepted accounting principles in effect in the United States of America from time to time.

"Gross Appraised Value" shall have the meaning set forth in Section 11.4 hereof.

"Gross Asset Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Management Committee provided that the initial Gross Asset Values of the assets contributed to the Company pursuant to Section 2.1 hereof shall be as set forth in such section;

(ii) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account, as determined by the Management Committee as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; and (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), provided that an adjustment described in clauses (A) and (B) of this paragraph shall be made

9

only if the Management Committee reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(iii) The Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Management Committee; and

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and subparagraph (vi) of the definition of "Profits" and "Losses" or Section 3.3(c) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (ii) or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

"Involuntary Bankruptcy" has the meaning set forth in the definition of Bankruptcy.

"Issuance Items" has the meaning set forth in Section 3.3(h) hereof.

"Liquidation Period" has the meaning set forth in Section 12.6 hereof.

"Liquidator" has the meaning set forth in Section 12.8(a) hereof.

"Losses" has the meaning set forth in the definition of "Profits" and "Losses."

"Manager" means any of the individuals elected by the Members to serve on the Management Committee and "Managers" means all of such individuals.

"Management Committee" has the meaning set forth in section 5.1(a) hereof.

"Member" means any Person (i) who is referred to as such on Exhibit A to this Agreement, or who has become a substituted Member pursuant to the terms of this Agreement and (ii) who has not ceased to be a Member.

"Members" mean all such Persons.

"Member Nonrecourse Debt" has the same meaning as the term "Member nonrecourse debt" in Section 1.704-2(b)(4) of the Regulations.

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Member Nonrecourse Deductions" has the same meaning as the term "Member nonrecourse deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

"Net Cash Flow" means the gross cash proceeds of the Company less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Management Committee. "Net Cash Flow" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

"Net Equity" shall have the meaning set forth in Section 11.3 hereof.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Notice Members" shall have the meaning set forth in Section 10.1 hereof.

"Offer Notice" shall have the meaning set forth in Section 10.4(b) hereof.

"Offer Period" shall have the meaning set forth in Section 101.4(c) hereof.

"Offer Price" shall have the meaning set forth in Section 10.4(a) hereof.

"Offered Units" shall have the meaning set forth in Section 10.4 hereof.

"Parent" means the father or mother of a Member.

"Percentage Interest" means, with respect to any Member as of any date, the ratio (expressed as a percentage) of the number of Units held by such Member on such date to the aggregate Units held by all Members on such date. The Percentage Interest of each Member immediately after the Effective Date is set forth in Section 2.1 hereof.

"Permitted Transfer" has the meaning set forth in Section 10.2 hereof.

"Person" means any individual, Company (whether general or limited), Limited Liability Company, corporation, trust, estate, association, nominee or other entity.

"Profits" and "Losses" mean, for each Allocation Year, an amount equal to the Company's taxable income or loss for such Allocation Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(i)   Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(ii)   Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(iii)   In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(iv)   Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v)   In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year, computed in accordance with the definition of Depreciation;

(vi)   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704-(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii)   Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 3.3 or Section 3.4 hereof shall not be taken into account in computing Profits or Losses.

12

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 3.3 and 3.4 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

"Property" means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

"Purchase Notice" shall have the meaning set forth in Section 11.1(d) hereof.

"Purchase Notice Member" shall have the meaning set forth in Section 11.1(d) hereof.

"Purchase Offer" shall have the meaning set forth in Section 10.4(a) hereof.

"Purchaser" shall have the meaning set forth in Section 10.4(a) hereof.

"Purchasing Members" shall have the meaning set forth in Section 11.1(d) hereof.

"Reconstitution Period" has the meaning set forth in Section 12.1(b) hereof.

"Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"Regulatory Allocations" has the meaning set forth in Section 3.4 hereof.

"Second Appraiser" shall have the meaning set forth in Section 11.4 hereof.

"Selling Members" shall have the meaning set forth in Section 11.1(d) hereof.

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiary" means any corporation, Company, joint venture, limited liability company, association or other entity in which such Person owns, directly or indirectly, fifty percent (50%) or more of the outstanding equity securities or interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such entity.

"Tax Matters Member" has the meaning set forth in Section 8.3(a) hereof.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of.

"Units or Unit" means an ownership interest in the Company representing a Capital Contribution of at least $1,000.00, including any and all benefits to which the holder of such Units may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement.

"Voluntary Bankruptcy" has the meaning set forth in the definition of "Bankruptcy."

"Wholly Owned Affiliate" of any Person means an Affiliate of such Person (i) one hundred percent (100%) of the voting stock or beneficial ownership of which is owned directly by such Person, or by any Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, (ii) an Affiliate to such Person who, directly or indirectly, owns one hundred percent (100%) of the voting stock or beneficial ownership of such Person, and (iii) any Wholly Owned Affiliate of any Affiliate described in clause (i) or clause (ii).

## SECTION 2 - MEMBERS' CAPITAL CONTRIBUTIONS

2.1 Original Capital Contributions.   The name and initial Percentage Interest of the Member is as follows:

| Member Names | Percentage Interest |
|---|---|
| SERGIO A. PAGLIERY, Jr. and JESSICA F. PAGLIERY, as Tenants by the Entireties | 20% |
| OMNIS B. ACEBO | 20% |
| NANCY FLATLEY | 20% |
| CAROLE W. LANGER | 10% |
| POINT ONE, LLC, a USVI limited liability company | 30% |

2.2 Contribution Agreements.  The contributions made by each of the Members pursuant to Section 2.1 hereof shall be subject to the terms and provisions of the Original Contribution Agreement of each such Member, if any. The Management Committee, on behalf of the Company, shall enter into the Original Contribution Agreements, and any agreement referred to therein, without requirement of any further act, approval, or vote of any other Person and such agreements shall be deemed to satisfy all requirements of this Agreement.  (See Exhibit A attached hereto for list of capital contributions.)

2.3 Additional Capital Contributions.   The Members may make additional Capital Contributions only with the written consent of all Members, in which event the Company shall issue to the contributing Member additional Units of an amount to be unanimously agreed by the Members.

# SECTION 3 - ALLOCATIONS

3.1 Profits.  After giving effect to the special allocations set forth in Sections 3.3 and 3.4, Profits for any Allocation Year shall be allocated to the Members in proportion to their Percentage Interests.

3.2 Losses.  After giving effect to the special allocations set forth in Sections 3.3 and 3.4 and subject to Section 3.5, Losses for any Allocation Year shall be allocated to the Members in proportion to their Percentage Interests.

3.3 Special Allocations.  The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in Company Minimum Gain during any Allocation Year, each Member shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with sections 1.704-2(f) (6) and 1.704-2(j) (2) of the Regulations.  This Section 3.3(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(i) (4) of the Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i) (5) of the Regulations, shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i) (4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i) (4) and 1.704-2(j) (2) of the Regulations.  This Section 3.3(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i) (4) of the Regulations and shall be interpreted consistently therewith.

(c) Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the

Member as quickly as possible, provided that an allocation pursuant to this Section 3.3(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.3(c) were not in the Agreement.

(d)   Gross Income Allocation.   In the event any Member has a deficit Capital Account at the end of any Allocation Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 3.3(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 3 have been made as if Section 3.3(c) and this Section 3.3(d) were not in the Agreement.

(e)   Nonrecourse Deductions.   Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Members in proportion to their respective Percentage Interests.

(f)   Member Nonrecourse Deductions.   Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i) (1).

(g)   Section 754 Adjustments.   To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(h)   Allocations Relating to Taxable Issuance of Company Units.   Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of Units by the Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

3.4 Curative Allocations.   The allocations set forth in Sections 3.3(a), 3.3(b), 3.3(c), 3.3(d), 3.3(e), 3.3(f), 3.3(g) and 3.5 (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.   It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to

this Section 3.4.  Therefore, notwithstanding any other provision of this Section 3 (other than the Regulatory Allocations), the Management Committee shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 3.1, 3.2, and 3.3(h).

3.5 Loss Limitation.  Losses allocated pursuant to Section 3.2 hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Allocation Year.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 3.2 hereof, the limitation set forth in this Section 3.5 shall be applied on a Member by Member basis and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Regulations.

3.6 Other Allocation Rules.  (a)  For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Management Committee using any permissible method under Code Section 706 and the Regulations thereunder.

(b)  The Members are aware of the income tax consequences of the allocations made by this Section 3 and hereby agree to be bound by the provisions of this Section 3 in reporting their shares of Company income and loss for income tax purposes.

(c)  Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a) (3), the Members' interests in Company profits are in proportion to their Percentage Interests.

To the extent permitted by Section 1.704-2(h) (3) of the Regulations, the Manager shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Member.

3.7 Tax Allocations: Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value) using the Traditional Method with Curative Allocations as described in the Regulation 1.704-3.

In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Management Committee in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 3.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

## SECTION 4 - DISTRIBUTIONS

4.1 Net Cash Flow. Except as otherwise provided in Section 12 hereof, Net Cash Flow, if any, shall be distributed not later than the thirtieth day after the end of each Fiscal Quarter, to the Members in proportion to their Percentage Interests.

4.2 Amounts Withheld. All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 4.2 for all purposes under this Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

4.3 Limitations on Distributions. (a) The Company shall make no distributions to the Members except (i) as provided in this Section 4 and Section 12 hereof, or (ii) as agreed to by all of the Members.

(b) A Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liability to Members on account of their Capital Contributions, would exceed the fair value of the Company's assets.

## SECTION 5 - MANAGEMENT

5.1 Managers; Management Committee. (a) The management of the Company shall be vested in the committee of Managers (the "Management Committee") designated by the Members as provided in Section 5.1(c) hereof.

(b)  The number of Managers on the Management Committee shall be one (1), unless otherwise provided herein.  The initial Manager of the Company shall be **SERGIO A. PAGLIERY**.

(c)  A Manager shall remain in office until removed by the Members designating such Manager.  Each Member shall designate a Manager for each single Unit held by it, him, or her.  Members shall designate Managers with respect to any Manager other than the initial Managers listed in subparagraph (b) hereinabove, by delivering to the Company their written statement designating their Manager or Managers and setting forth such Manager's or Managers' business address and telephone number.  The Members, by signing this Agreement, hereby designate the Persons identified above as Manager of the Company until his successor is designated and appointed.

(d)  A Manager may be removed at any time, with or without cause, by the written notice of the Members that designated such Manager, delivered to the Company, demanding such removal and designating the Person who shall fill the position of the removed Manager.

(e)  In the event any Manager dies or is unwilling or unable to serve as such or is removed from office by the Members that designated such Manager, the appropriate Members shall promptly designate a successor to such Manager.  A Manager chosen to fill a vacancy shall be designated by the Members whose previously designated Manager shall have been removed or shall have resigned.

(f)  Each Manager shall have one (1) vote.  Except as otherwise provided in this Agreement, the Management Committee shall act by the affirmative vote of a majority of the total number of members of the Committee.

(g)  Notwithstanding subsection (f) above, in the event the Company has a deadlock, as hereinafter defined in subsection (h) below, **SERGIO A. PAGLIERY**, shall act as Swing-Vote Director or Swing-Vote Member, as the case may be, and shall be entitled to cast the tie breaking vote at the meetings of the Board of Directors and/or the meetings of the Members.

(h)  For purposes of subsection (g) above, a "deadlock" of the Company shall be deemed to exist whenever either (i) the Board of Directors of the Company shall fail to approve any action properly before the Board of Directors by reason of a tie vote taken at a duly noticed and convened meeting of the Board of Directors or otherwise (hereinafter referred to as a "Board Deadlock"), or (ii) the Members shall fail to approve any action properly before the Members or with respect to any matter that is specifically required by law to be made by the Members by reason of a tie vote taken at a duly noticed and convened meeting of the Members or otherwise (herein referred to as a "Member Deadlock"), and in the further event that such Board Deadlock or such Member Deadlock, as the case may be, is not conclusively resolved and evidenced by a duly executed written consent in lieu of a special meeting of the Board of Directors or of the Members, as the case may be, within ten (10) calendar days immediately following the date of such Board of Director or Member Deadlock.

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

(i)   Each Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  A person who so performs his duties shall not have any liability by reason of being or having been a Manager of the Company.

(j)   The Management Committee shall have the power to delegate authority to such committees of Managers, officers, employees, agents and representatives of the Company as it may from time to time deem appropriate.  Any delegation of authority to take any action must be approved in the same manner as would be required for the Management Committee to approve such action directly.

(k)  A Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

5.2 Meetings of the Management Committee.  (a)   The Management Committee shall hold regular meetings no less frequently than once every Fiscal Quarter and shall establish meeting times, dates and places and requisite notice requirements (not shorter than those provided in Section 5.2(b)) and adopt rules or procedures consistent with the terms of this Agreement.  Unless otherwise approved by the Management Committee, each regular meeting of the Management Committee will be held at the Company's principal place of business.  At such meetings the Management Committee shall transact such business as may properly be brought before the meeting, whether or not notice of such meeting referenced the action taken at such meeting.

(b)   Special meetings of the Management Committee may be called by any Manager.  Notice of each such meeting shall be given to each Manager on the Management Committee by telephone, telecopy, telegram or similar method (in each case, notice shall be given at least seventy-two (72) hours before the time of the meeting) or sent by first-class mail (in which case notice shall be given at least five (5) days before the meeting), unless a longer notice period is established by the Management Committee.  Each such notice shall state (i) the time, date, place (which shall be at the principal office of the Company unless otherwise agreed to by all Managers) or other means of conducting such meeting and (ii) the purpose of the meeting to be so held.  No actions other than those specified in the notice may be considered at any special meeting unless unanimously approved by the Managers.  Any Manager may waive notice of any meeting in writing before, at, or after such meeting.  The attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except when a Manager attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not properly called.

(c)  Any action required to be taken at a meeting of the Management Committee, or any action that may be taken at a meeting of the Management Committee, may be taken at a meeting held by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in such a meeting shall constitute presence in person at such meeting.

(d)  Notwithstanding anything to the contrary in this Section 5.2, the Management Committee may take without a meeting any action that may be taken by the Management Committee under this Agreement if such action is approved by the unanimous written consent of the Managers.

5.3  Management Committee Powers.  (a)  Except as otherwise provided in this Agreement, all powers to control and manage the Business and affairs of the Company shall be exclusively vested in the Management Committee and the Management Committee may exercise all powers of the Company and do all such lawful acts as are not by statute, the Certificate or this Agreement directed or required to be exercised or done by the Members and in so doing shall have the right and authority to take all actions which the Management Committee deems necessary, useful or appropriate for the management and conduct of the Business, including exercising the following specific rights and powers:

(i)  Conduct its business, carry on its operations and have and exercise the powers granted by the Florida Act in any state, territory, district or possession of the United States, or in any foreign country which may be necessary or convenient to effect any or all of the purposes for which it is organized;

(ii)  Acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(iii)  Operate, maintain, finance, improve, construct, own, grant operations with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(iv)  Execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Business, or in connection with managing the affairs of the Company, including, executing amendments to this Agreement and the Certificate in accordance with the terms of this Agreement, both as Managers and, if required, as attorney-in-fact for the Members pursuant to any power of attorney granted by the Members to the Managers;

(v)  Borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Company assets;

(vi)  Execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company assets;

(vii)  Prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such assets;

(viii)   Care for and distribute funds to the Members by way of cash income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(ix)  Contract on behalf of the Company for the employment and services or employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(x)  Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company assets and Manager liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

(xi)  Take, or refrain from taking, all actions, not expressly proscribed or limited by this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company;

(xii)  Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company, the Members or any Manager in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(xiii)  Purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited Company's, other limited liability companies, or individuals or direct or indirect obligations of the United States or of any government, state, territory, government district or municipality or of any instrumentality of any of them;

(xiv)  Indemnify a Member or Manager or former Member or Manager, and to make any other indemnification that is authorized by this Agreement in accordance with the Act.

(b)  The Management Committee will appoint the senior management of the Company and will establish policies and guidelines for the hiring of employees to permit the Company to act as an operating company with respect to its Business.  The Management Committee may adopt appropriate management incentive plans and employee benefit plans.  The senior management of the Company shall be responsible for conducting, in the name of, and on behalf of, the Company, the day-to-day business and affairs of the Company.

5.4 Duties and Obligations of the Management Committee.  (a)  The Management Committee shall cause the Company to conduct its business and operations separate and apart from that of any Member or Manager or any of its Affiliates, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of, any Member

or Manager or any of its Affiliates, (ii) maintaining books and financial records of the Company separate from the books and financial records of any Member or Manager and its Affiliates, and observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company meetings and acting on behalf of the Company only pursuant to due authorization of the Members, (iii) causing the Company to pay its liabilities from assets of the Company, and (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

(b)   The Management Committee shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Florida and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Company to conduct the business in which it is engaged and (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement and applicable laws and regulations.

(c)   The Management Committee shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Members, including the safekeeping and use of all of the Property and the use thereof for the exclusive benefit of the Company.

5.5 Reimbursements.   The Company shall reimburse the Members and Managers for all expenses incurred and paid by any of them in the organization of the Company and as authorized by the Company, in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company.  Such expenses shall not include any expenses incurred in connection with a Member's or Managers' exercise of its rights as a Member or a Manager apart from the authorized conduct of the Company's business.  The Manager's sole determination of which expenses are allocated to and reimbursed as a result of the Company's activities or business and the amount of such expenses shall be conclusive.  Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss or capital of the Company.

5.6  Indemnification of the Managers.  (a)  Unless otherwise provided in Section 5.6(d) hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of Company Property) shall indemnify, save harmless, and pay all judgments and claims against any Manager relating to any liability or damage incurred by reason of any act performed or omitted to be performed by any Manager in connection with the Business, including reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred.

(b)  Unless otherwise provided in Section 5.6(d) hereof, in the event of any action by a Member against any Manager, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of such Manager, including reasonable attorneys' fees incurred in the defense of such action.

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

(c)   Unless otherwise provided in Section 5.6(d) hereof, the Company shall indemnify, save harmless, and pay all expenses, costs, or liabilities of any Manager, if for the benefit of the Company and in accordance with this Agreement said Manager makes any deposit or makes any other similar payment or assumes any obligation in connection with any Property proposed to be acquired by the Company and suffers any financial loss as the result of such action.

(d)   Notwithstanding the provisions of Sections 5.6(a), 5.6(b) and 5.6(c) above, such Sections shall be enforced only to the maximum extent permitted by law and no Manager shall be indemnified from any liability for the fraud, intentional misconduct, gross negligence or a knowing violation of the law which was material to the cause of action.

(e)   The obligations of the Company set forth in this Section 5.6 are expressly intended to create third party beneficiary rights of each of the Managers and any Member is authorized, on behalf of the Company, to give written confirmation to any Manager of the existence and extent of the Company's obligations to such Manager hereunder.

## SECTION 6 - ROLE OF MEMBERS

6.1 Rights or Powers.  The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.   Notwithstanding the foregoing, the Members have all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the Act.

6.2 Voting Rights.  No Member has any voting right except with respect to those matters specifically reserved for a Member vote which are set forth in this Agreement and as required in the Act.

6.3 Meetings of the Members.  (a)  Meetings of the Members may be called upon the written request of any Member.  The call shall state the location of the meeting and the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members not less than seven (7) business days nor more than thirty (30) days prior to the date of such meeting. Members may vote in person, by proxy or by telephone at such meeting and may waive advance notice of such meeting.  Whenever the vote or consent of Members is permitted or required under the Agreement, such vote or consent may be given at a meeting of the Members or may be given in accordance with the procedure prescribed in this Section 6.4.  Except as otherwise expressly provided in the Agreement, the unanimous vote of the Members shall be required to constitute the act of the Members.

(b)  For the purpose of determining the Members entitled to vote on, or to vote at, any meeting of the Members or any adjournment thereof, the Management Committee or the Member requesting such meeting may fix, in advance, a date as the record date for any such determination.  Such date shall not be more than thirty (30) days nor less than ten (10) Business Days before any such meeting.

(c)  Each Member may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every proxy must be signed by the Member or its attorney-in-fact.  No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the Member executing it.

(d)  Each meeting of Members shall be conducted by the Chief Executive Officer or such other individual Person as the Chief Executive Officer deems appropriate.

(e)  Notwithstanding this Section 6.4, the Company may take any action contemplated under this Agreement as approved by the consent of the Members, such consent to be provided in writing, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a written summary of the telephone conversation or facsimile communication sent by registered or certified mail, postage and charges prepaid, addressed as described in Section 14.1 hereof, or to such other address as such Person may from time to time specify by notice to the Members and Managers.

6.4 Required Member Consents.  Notwithstanding any other provision of this Agreement, no action may be taken by the Company (whether by the Management Committee, or otherwise) in connection with any of the following matters without the written consent of a majority of the Members:

(a)  Any activity that is not consistent with the purposes of the Company as set forth in section 1.3 hereof;

(b)  Any act in contravention of this Agreement;

(c)  Confession of a judgment against the Company in an amount in excess of $1,000.00;

(d)  A material change in the nature of the Business;

(e)  Any sale of assets of the Company involving total consideration in excess of $10,000.00;

(f)  Any transaction by the Company involving the incurrence of any indebtedness for borrowed money in excess of $5,000.00 or the issuance of any equity or any equity-based security by the Company;

(g)  Any capital expenditures in excess of $5,000.00;

(h)  Any transaction between the Company and any Member, Manager or Affiliate thereof which the Management Committee does not determine is on an arm's-length basis;

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

      (i)   Any material acquisition by the Company involving total consideration in excess of $10,000.00;

      (j)   Any transaction to liquidate or dissolve the Company; and

      (k)   Any transaction by the Company to merge or consolidate with another Person.

     6.5 Withdrawal and Resignation.  Except as otherwise provided in Sections 4 and 12 hereof, no Member shall demand or receive a return on or of its Capital Contributions or withdraw from the Company without the consent of all Members.  Except as otherwise provided in the Act or this Agreement, upon resignation, any resigning member is entitled to receive only the distribution to which he is entitled under this Agreement, which shall be equal to the fair value of his Units in the Company as of the date of resignation.  Under circumstances requiring a return of any Capital Contributions, no Member has the right to receive Property other than cash except as may be specifically provided herein.

     6.6 Member Compensation.  No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company, or otherwise, in its capacity as a Member, except as otherwise provided in this Agreement.

     6.7 Members Liability.  No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the Debts or any other obligations or liabilities of the Company.  A Member shall be liable only to make its Capital Contributions and shall not be required to restore a deficit balance in its Capital Account or to lend any funds to the Company or, after its Capital Contributions have been made, to make any additional contributions, assessments or payments to the Company, provided that a Member may be required to repay distributions made to it as provided herein or by the Act.  The Manager shall not have any personal liability for the repayment of any Capital Contributions of any Member.

     6.8 Partition.  While the Company remains in effect or is continued, each Member agrees and waives its rights to have any Company Property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any Company Property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

     6.9 Confidentiality.  Except as contemplated hereby or required by a court of competent authority, each Member shall keep confidential and shall not disclose to others and shall use its reasonable efforts to prevent its Affiliates and any of its, or its Affiliates', present or former employees, agents, and representatives from disclosing to others without the prior written consent of all Members any information which (i) pertains to this Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the Business of the Company, or (ii) pertains to confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary; provided that any Member may disclose to its Parent and its Parent's employees, agents, and representatives any

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

information made available to such Member. No Member shall use, and each Member shall use its best efforts to prevent any Affiliate of such Member from using, any information which (i) pertains to this Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or the Business of the Company, or (ii) pertains to the confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary, except in connection with the transactions contemplated hereby. The term "confidential information" is used in this Section 6.8 to describe information which is confidential, non-public or proprietary in nature, was provided to such Member or its representatives by the Company, any other Member, or such Persons' agents, representatives and employees, and relates either directly, or indirectly to the Company or the Business. Information which (i) is available, or becomes available, to the public through no fault or action by such Member, its agents, representatives or employees or (ii) becomes available on non-confidential basis from any source other than the Company, any other Member, or such Persons' agents, representatives or employees and such source is not prohibited from disclosing such information, shall not be deemed confidential information.

6.10 **Transactions between a Member and the Company.** Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member. A Member, any Affiliate thereof or an employee, stockholder, agent, director or officer of a Member or any Affiliate thereof, may also be an employee or be retained as an agent of the Company. The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

6.11 **Other Instruments.** Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Management Committee deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement.

## SECTION 7 - REPRESENTATIONS AND WARRANTIES

7.1 **In General.** As of the date hereof, each of Members hereby makes each of the representations and warranties applicable to such Member as set forth in Section 7.2 hereof, and such warranties and representations shall survive the execution of this Agreement.

7.2 **Representations and Warranties.** Each Member hereby represents and warrants that:

(a) **Due Incorporation or Formation; Authorization of Agreement.** Such Member is a corporation duly organized or a partnership or limited liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership, or company power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such

27

Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Member has the corporate, partnership or company power and authority to execute and deliver this Agreement and to perform its obligations hereunder and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate, partnership, or company action. This Agreement constitutes the legal, valid, and binding obligation of such Member.

(b) No Conflict with Restrictions; No Default. Neither the execution, delivery, and performance of this Agreement nor the consummation by such Member of the transactions contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member, its Parent, or any of its Wholly Owned Affiliates, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement or operating agreement of such Member, its Parent, or any of its Wholly Owned Affiliates or of any material agreement or instrument to which such Member, its Parent, or any of its Wholly Owned Affiliates is a party or by which such Member, its Parent, or any of its Wholly Owned Affiliates is or may be bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member, its Parent, or any of its Wholly Owned Affiliates is a party or by which such Member, its Parent, or any of its Wholly Owned Affiliates is or may be bound, or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member, its Parent, or any of its Wholly Owned Affiliates.

(c) Governmental Authorizations. Any registration, declaration, or filing with, or consent, approval, license, permit, or other authorization or order by, any governmental or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance and performance by such Member under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date.

(d) Litigation. There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Member or any of its Wholly Owned Affiliates, threatened against or affecting such Member or any of its Wholly Owned Affiliates or any of their properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, which if adversely determined could) reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member; and such Member or any of its Wholly Owned

28
OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

Affiliates has not received any currently effective notice of any default, and such Member or any of its Wholly Owned Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member.

(e) Investment Company Act; Public Utility Holding Company Act. Neither such Member nor any of its Affiliates is, nor will the Company as a result of such Member holding an interest therein be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940. Neither such Member nor any of its Affiliates is, nor will the Company as a result of such Member holding an Interest therein be, a "holding company," "an affiliate of a holding company," or a "subsidiary of a holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

(f) Subsidiary. All of the outstanding capital stock or ownership interests in the capital and profits of such Member is owned, directly or indirectly, by its Parent.

(g) Investigation. Such Member is acquiring its Units based upon its own investigation, and the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis, and expertise. Such Member's acquisition of its Units is being made for its own account for investment, and not with a view to the sale or distribution thereof. Such Member is a sophisticated investor possessing an expertise in analyzing the benefits and risks associated with acquiring investments that are similar to the acquisition of its Units.

SECTION 8 - ACCOUNTING, BOOKS AND RECORDS

8.1 Accounting, Books and Records. (a) The Company shall keep on site at its principal place of business each of the following:

(i) Separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of the Business in accordance with this Agreement.

(ii) A current list of the full name and last known business, residence, or mailing address of each Member and Manager, both past and present;

(iii) A copy of the Certificate and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv) Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(v) Copies of this Agreement;

(vi) Copies of any writings permitted or required under Section 18-502 of the Act regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

(vii) Unless contained in this Agreement, a statement prepared and certified as accurate by the Management Committee of the Company which describes:

(A) The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future;

(B) The times at which or events on the happening of which any Additional Capital Contributions agreed to be made by each Member are to be made;

(C) If agreed upon, the time at which or the events on the happening of which a Member may terminate his Units in the Company and the amount of, or the method of determining, the distribution to which he may be entitled respecting his Units and the terms and conditions of the termination and distribution;

(D) Any right of a Member to receive distributions, which include a return of all or any part of a Member's contribution;

(viii) Any written consents obtained from Members pursuant to Section 18-302 of the Act regarding action taken by Members without a meeting.

(b) The Company shall use the accrual method of accounting in preparation of its financial reports and for tax purposes and shall keep its books and records accordingly. Any Member or its designated representative has the right to have reasonable access to and inspect and copy the contents of such books or records and shall also have reasonable access during normal business hours to such additional financial information, documents, books and records. The rights granted to a Member pursuant to this Section 8.1 are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established from time to time.

8.2 Reports.   (a)   In General.   The chief financial officer of the Company shall be responsible for causing the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

(b) Periodic and Other Reports.   The Company shall cause to be delivered to each Member the financial statements listed in clauses (i) and (ii) below, prepared, in each case (other than with respect to Member's Capital Accounts, which shall be prepared in accordance with this Agreement) in accordance with GAAP consistently applied (and, if required by any Member or its Controlled Affiliates for purposes of reporting under the Securities Exchange Act of 1934, Regulation S-X), and such other reports as any Member may reasonably

request from time to time; <u>provided</u> that, if the Management Committee so determines within thirty (30) days thereof, such other reports shall be provided at such requesting Member's sole cost and expense. The monthly and quarterly financial statements referred to in clause (ii) below may be subject to normal year-end audit adjustments.

(i) As soon as practicable following the end of each Fiscal Year (and in any event not later than ninety (90) days after the end of such Fiscal Year) and at such time as distributions are made to the Members pursuant to Section 12 hereof following the occurrence of a Dissolution Event, a balance sheet of the Company as of the end of such Fiscal Year and the related statements of operations, Members' Capital Accounts and changes therein, and cash flows for such Fiscal Year, together with appropriate notes to such financial statements and supporting schedules, all of which shall be audited and certified by the Company's accountants, and in each case, to the extent the Company was in existence, setting forth in comparative form the corresponding figures for the immediately preceding Fiscal Year end (in the case of the balance sheet) and the two (2) immediately preceding Fiscal Years (in the case of the statements).

(ii) As soon as practicable following the end of each of the first three Fiscal Quarters of each Fiscal Year (and in any event not later than sixty (60) days after the end of each such Fiscal Quarter), a balance sheet of the Company as of the end of such Fiscal.Quarter and the related statements of operations and cash flows for such Fiscal Quarter and for the Fiscal Year to date, in each case, to the extent the Company was in existence, setting forth in comparative form the corresponding figures for the prior Fiscal Year's Fiscal Quarter and the interim period corresponding to the Fiscal Quarter and the interim period just completed.

The quarterly or monthly statements described in clause (ii) above shall be accompanied by a written certification of the chief financial officer of the Company that such statements have been prepared in accordance with GAAP consistently applied or this Agreement, as the case may be.

8.3 Tax Matters. (a) Tax Elections. The Management Committee shall, without any further consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election, if permitted by applicable law: (i) to adjust the basis of Property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state, local or foreign law, in connection_with Transfers of Units and Company distributions; (ii) with the consent of all of the Members, to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local or foreign tax returns; and (iii) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members. **SERGIO A. PAGLIERY** is specifically authorized to act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

(b)  Tax Information.  Necessary tax information shall be delivered to each Member as soon as practicable after the end of each Fiscal Year of the Company but not later than five (5) months after the end of each Fiscal Year.

## SECTION 9 - AMENDMENTS

9.1 Amendments.  (a)  Amendments to this Agreement may be proposed by any Manager or any Member.  Following such proposal, the Management Committee shall submit to the Members a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Management Committee shall include in any such submission a recommendation as to the proposed amendment.  The Management Committee shall seek the written vote of the Members on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate.  A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the affirmative vote of a majority of the Members.

(b)  Notwithstanding Section 9.1(a) hereof, this Agreement shall not be amended without the consent of each Member adversely affected if such amendment would modify the limited liability of a Member, or (ii) alter the interest of a Member in Profits, Losses, other items, or any Company distributions.

## SECTION 10 - TRANSFERS

10.1 Restrictions on Transfers.  Except as otherwise permitted by this Agreement, no Member shall Transfer all or any portion of its Units.  In the event that any Member pledges or otherwise encumbers all or any part of its Units as security for the payment of a Debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this Section 10.

10.2 Permitted Transfers.  Subject to the conditions and restrictions set forth in Section 10.3 hereof, a Member may at any time Transfer all or any portion of its Units to (a) any other Member or Wholly Owned Affiliate of another Member, (b) any Wholly Owned Affiliate of the transferor, (c) the transferor's administrator or trustee to whom such Units is transferred involuntarily by operation of law, or (d) any Purchaser in accordance with Section 10.4 hereof (any such Transfer being referred to in this Agreement as a "Permitted Transfer").

10.3 Conditions to Permitted Transfers.  A Transfer shall not be treated as a Permitted Transfer under Section 10.2 hereof unless and until the following conditions are satisfied:

(a)  Except in the case of a Transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company (i) such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer.  In the case of a Transfer of Units involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company.  In all cases, the

Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b)   The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Units transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Units until it has received such information.

(c)   Except in the case of a Transfer of an Units involuntarily by operation of law, either (a) such Units shall be registered under the Securities Act, and any applicable state securities laws, or (b) the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Management Committee, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

(d)   Except in the case of a Transfer of Units involuntarily by operation of law, the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the other Management Committee, to the effect that such Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940.

(e)   Unless otherwise approved by the Management Committee, no Transfer of Units shall be made except upon terms which would not, in the opinion of counsel chosen by and mutually acceptable to the Management Committee and the transferor Member, result in the termination of the Company within the meaning of Section 708 of the Code or cause the application of the rules of Sections 168(g)(1)(B) and 168(h) of the Code or similar rules to apply to the Company. If the immediate Transfer of such Unit would, in the opinion of such counsel, cause a termination within the meaning of Section 708 of the Code, then if, in the opinion of such counsel, the following action would not precipitate such termination, the transferor Member shall be entitled (or required, as the case may be) (i) immediately to Transfer only that portion of its Units as may, in the opinion of such counsel, be transferred without causing such a termination and (ii) to enter into an agreement to Transfer the remainder of its Units, in one or more Transfers, at the earliest date or dates on which such Transfer or Transfers may be effected without causing such termination. The purchase price for the Units shall be allocated between the immediate Transfer and the deferred Transfer or Transfers pro rata on the basis of the percentage of the aggregate Units being transferred, each portion to be payable when the respective Transfer is consummated, unless otherwise agreed by the parties to the Transfer. In the case of a Transfer by one Member to another Member, the deferred purchase price shall be deposited in an interest-bearing escrow account unless another method of securing the payment thereof is agreed upon by the transferor Member and the transferee Member(s). In determining whether a particular proposed Transfer will result in a termination of the Company, counsel to the Company shall take into account the existence of prior written commitments to Transfer

33

made pursuant to this Agreement and such commitments shall always be given precedence over subsequent proposed Transfers.

(f)   No notice or request initiating the procedures contemplated by Section 12.4 may be given by any member, while any notice, purchase or Transfer is pending under Section 10.4 or Section 11, as the case may be, or after a Dissolution Event has occurred. If any Member is an Adverse Member, the other Members shall not be required to offer any portion of its Unit pursuant to Section 10.4, during the period that the Company is pursuing any remedy specified in Section 11.1 with respect to such Member's status as an Adverse Member. No Member may sell any portion of its Unit pursuant to Section 10.4 during any period that, as provided above, it may not give the notice initiating the procedures contemplated by such Section or thereafter until it has given such notice and otherwise complied with the provisions of such Section.

10.4  Right of First Refusal.  In addition to the other limitations and restrictions set forth in this Section 10, except as permitted by Section 10.2 hereof, no Member shall Transfer all or any portion of its Units (the "Offered Units") unless such Member (the "Seller") first offers to sell the Offered Units pursuant to the terms of this Section 10.4.

(a)   Limitation on Transfers.  No Transfer may be made under this Section 10.4 unless the Seller has received a bona fide written offer (the "Purchase Offer") from a Person (the "Purchaser") to purchase the Offered Units for a purchase price (the "Offer Price") denominated and payable in United States dollars at closing or according to specified terms, with or without interest, which offer shall be in writing signed by the Purchaser and shall be irrevocable for a period ending no sooner than the Business Day following the end of the Offer Period, as hereinafter defined.

(b)   Offer Notice.  Prior to making any Transfer that is subject to the terms of this Section 10.4, the Seller shall give to the Company and each other Member written notice (the "Offer Notice") which shall include a copy of the Purchase Offer and an offer (the "Firm Offer") to sell the Offered Units to the other Members (the "Offerees") for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer, provided that the Firm Offer shall be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Interest) to be provided by the Purchaser for any deferred portion of the Offer Price.

(c)   Offer Period.  The Firm Offer shall be irrevocable for a period (the "Offer Period") ending at 11:59 P.M., local time at the Company's principal place of business, on the ninetieth day following the day of the Offer Notice.

(d)   Acceptance of First Offer.  At any time during the Offer Period, any Offeree may accept the Firm Offer as to all or any portion of the Offered Interest, by giving written notice of such acceptance to the Seller and each other offeree, which notice shall indicate the maximum number of Units that such Offeree is willing to purchase. In the event that Offerees ("Accepting Offerees"), in the aggregate, accept the Firm Offer with respect to all of the Offered

Units, the Firm Offer shall be deemed to be accepted and each Accepting Offeree shall be deemed to have accepted the Firm Offer as to that portion of the Offered Units that corresponds to the ratio of the number of Units that such Accepting Offeree indicated a willingness to purchase to the aggregate number of Units all Accepting Offerees indicated a willingness to purchase. If Offerees do not accept the Firm Offer as to all of the Offered Units during the Offer Period, the Firm Offer shall be deemed to be rejected in its entirety.

(e) Closing of Purchase Pursuant to Firm Offer. In the event that the Firm Offer is accepted, the closing of the sale of the Offered Units shall take place within thirty (30) days after the Firm Offer is accepted or, if later, the date of closing set forth in the Purchase Offer. The Seller and all Accepting Offerees shall execute such documents and instruments as may be necessary or appropriate to effect the sale of the Offered Units pursuant to the terms of the Firm Offer and this Section 10.

(f) Sale Pursuant to Purchase Offer If Firm Offer Rejected. If the Firm Offer is not accepted in the manner hereinabove provided, the Seller may sell the Offered Units to the Purchaser at any time within sixty (60) days after the last day of the Offer Period, provided that such sale shall be made on terms no more favorable to the Purchaser than the terms contained in the Purchase Offer and provided further that such sale complies with other terms, conditions, and restrictions of this Agreement that are not expressly made inapplicable to sales occurring under this Section 10.4. In the event that the Offered Units are not sold in accordance with the terms of the preceding sentence, the Offered Units shall again become subject to all of the conditions and restrictions of this Section 10.4.

10.5 Prohibited Transfers. Any purported Transfer of Units that is not a Permitted Transfer shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Management Committee, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the Units Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Units, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Interest may have to the Company.

In the case of a Transfer or attempted Transfer of Units that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

10.6 Rights of Unadmitted Assignees. A Person who acquires Units but who is not admitted as a substituted Member pursuant to Section 10.7 hereof shall be entitled only to allocations and distributions with respect to such Units in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be

entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

10.7 Admission of Substituted Members. Subject to the other provisions of this Section 10, a transferee of Units may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this Section 10.7:

(a) A majority of the Members consent to such admission, which consent may be given or withheld in the sole and absolute discretion of the Members;

(b) The Units with respect to which the transferee is being admitted was acquired by means of a Permitted Transfer;

(c) The transferee of Units (other than, with respect to clauses (i) and (ii) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Management Committee (and, in the case of clause (iii) below, the transferor Member), (i) make representations and warranties to each nontransferring Member equivalent to those set forth in Section 7, (ii) accept and adopt the terms and provisions of this Agreement, including this Section 10, and (iii) assume the obligations of the transferor Member under this Agreement with respect to the transferred Units. The transferor Member shall be released from all such assumed obligations except (x) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement, (y) in the case of a Transfer to any Person other than a Member or any of its Controlled Affiliates, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer, and (z) in the case of a Transfer to any of its Controlled Affiliates, any Capital Contribution or other financing obligation of the transferor Member under this Agreement;

(d) The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Units; and

(e) Except in the case of a Transfer involuntarily by operation of law, if required by the Management Committee, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Management Committee reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer, including amendments to the Certificate or any other instrument filed with the State of Florida or any other state or governmental authority.

10.8 Representations Regarding Transfers; Legend. (a) Each Member hereby covenants and agrees with the Company for the benefit of the Company and all Members, that (i) it is not currently making a market in Units and will not in the future make a market in Units, (ii) it will not Transfer its Units on an established securities market, a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any Regulations, proposed Regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service

or Treasury Department that may be promulgated or published thereunder), and (iii) in the event such Regulations, revenue rulings, or other pronouncements treat any or all arrangements which facilitate the selling of Company interests and which are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, it will not Transfer any Units through a matching service that is not approved in advance by the Company. Each Member further agrees that it will not Transfer any Units to any Person unless such Person agrees to be bound by this Section 10.8(a) and to Transfer such Units only to Persons who agree to be similarly bound.

(b)   Each Member hereby represents and warrants to the Company and the Members that such Member's acquisition of Units hereunder is made as principal for such Member's own account and not for resale or distribution of such Units. Each Member further hereby agrees that the following legend may be placed upon any counterpart of this Agreement, the Certificate, or any other document or instrument evidencing ownership of Units:

The Company Units represented by this document have not been registered under any securities laws and the transferability of such Units is restricted. Such Units may not be sold, assigned, or transferred, nor will any assignee, vendee, transferee, or endorsee thereof be recognized as having acquired any such Units by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Units shall then be in effect and such transfer has been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company.

The Units represented by this document are subject to further restriction as to their sale, transfer, hypothecation, or assignment as set forth in the Operating Agreement and agreed to by each Member. Said restriction provides, among other things, that no Units may be transferred without first offering such Units to the other Members, and that no vendee, transferee, assignee, or endorsee of a Member shall have the right to become a substituted Member without the consent of a majority of the Members which consent may be given or withheld in the sole and absolute discretion of the Members.

10.9 Distributions and Allocations in Respect of Transferred Units. If any Units are Transferred during any Allocation Year in compliance with the provisions of this Section 10, Profits, Losses, each item thereof, and all other items attributable to the Transferred Units for such Allocation Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Percentage Interests during the Fiscal Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Management Committee. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten (10) Business Days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer, and provided further that if the Company does not receive a notice stating the date such Units were transferred and such other information as the Management Committee may reasonably require

within thirty (30) days after the end of the Allocation Year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the Units on the last day of such Allocation Year.  Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 10.9, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Units.

## SECTION 11 - ADVERSE ACT

11.1 Remedies.  (a)  If an Adverse Act has occurred or is continuing with respect to any Member, any non-Adverse Member whose Percentage Interest is greater than 60% may elect:

(i)   To cause the Company to commence the procedures specified in Section 11.2 for the purchase of the Adverse Member's Units; or

(ii)  To seek to enjoin such Adverse Act or to obtain specific performance of the Adverse Member's obligations or Damages (as defined and subject to the limitations specified below) in respect of such Adverse Act.

The foregoing remedies shall not be deemed to be mutually exclusive, and, subject to the requirements of this Section 11.1(a) regarding the timing of the election of such remedies, selection or resort to any thereof shall not preclude selection or resort to the others.

Notwithstanding anything to the contrary contained in this Section 11, the remedy specified in clause (i) above and the right to seek Damages under clause (ii) above may not be pursued and Section 11.1(b) will not apply to an Adverse Act specified in clause (ii) of the term "Adverse Act" in Section 1.10 until such time as there is a Final Determination that the Member's actions or failure to act constituted an Adverse Act, if the affected Member timely delivered a Contest Notice.

The election of a remedy specified in clause (i) or (ii) above may be exercised by notice given to the Adverse Member (A) in case of an Adverse Act specified in clause (i) of the definition of the term "Adverse Act" in Section 1.10, within ninety (90) days after the occurrence of such Adverse Act or (B) in the case of any other Adverse Act with respect to which such remedy is available, within ninety (90) days after the Member making such election obtains actual knowledge of the occurrence of such Adverse Act, including, if applicable, that any cure period has expired; provided that, if an election pursuant to clause (ii) above is made to seek an injunction, specific performance or other equitable relief and a final judgment in such action is rendered denying such equitable remedy and no election was made pursuant to clause (i) above, then, by notice given within ten (10) days after such final judgment is rendered, the non-Adverse Member may elect to pursue the remedies specified in clause (i) above unless (x) prior to the giving of such notice, the Adverse Member has cured in full (or caused to be cured in full) the Adverse Act in question and no other Adverse Act with respect to such Adverse Member has occurred and is continuing or (y) the final judgment denying equitable relief specifically held that there was no Adverse Act.

Except as provided in Section 11.1(b), the failure to elect a remedy with respect to the subject Adverse Act within the time periods provided in the preceding paragraph shall be conclusively presumed to be a waiver of the remedies provided in this Section 11 with respect to the subject Adverse Act.

Unless resort to such remedy has been waived as set forth in the immediately preceding paragraph, the Company shall be entitled to recover from the Adverse Member in an appropriate proceeding any and all damages, losses and expenses (including reasonable attorneys' fees and disbursements) (collectively, "Damages") suffered or incurred by the Company as a result of such Adverse Act; provided that the Company shall not have or assert any claim against the Adverse Member for punitive Damages or for indirect, special or consequential Damages suffered or incurred by the Company as a result of an Adverse Act; and provided further that the amount the Company may recover in any action for Damages shall be reduced by an amount equal to any positive difference between the Net Equity of the Adverse Member's Units and the applicable Buy-Sell Price.

The resort to any remedy pursuant to this Section 11.1(a) shall not for any purpose be deemed to be a waiver of any remedy not described in this Section 11.1(a) and otherwise available hereunder or under applicable law.

(b) If the Company is dissolved pursuant to Section 14.1(a) at any time as a result of a Liquidating Event that occurs prior to a remedy having been elected pursuant to Section 11.1(a) with respect to any Adverse Member, the time periods for such election shall thereupon expire and the Management Committee shall deduct from any amounts to be paid to such Adverse Member pursuant to Section 14.2 that amount which it reasonably estimates to be sufficient to compensate the non-Adverse Members for Damages incurred by them as a result of the Adverse Act (subject to the limitations of Section 11.1(a)) and shall pay the same to the non-Adverse Members on behalf of the Adverse Member.

11.2 Adverse Act Purchase. (a) Determination of Net Equity of Adverse Member's Units. If any Member makes an election pursuant to Section 11.1(a)(i) to commence the purchase procedures set forth in this Section 11.2, the Net Equity of the Adverse Member's Units shall be determined in accordance with this Section 11 as of the last day of the Fiscal Quarter immediately preceding the Fiscal Quarter in which notice of such election (the "Election Notice") was given to the Adverse Member, and the Adverse Member shall be obligated to sell to the Purchasing Member all but not less than all of the Adverse Member's Units in accordance with this Section 11.2 at a purchase price (the "Buy-Sell Price") equal to (A) in the case of any Adverse Act other than an Adverse Act identified in clause (iv) of the definition of "Adverse Act" in Section 1.10, ninety percent (90%) of the Net Equity thereof as so determined, and (B) in the case of an Adverse Act specified in clause (iv), the Net Equity thereof. Such Election Notice shall designate the First Appraiser as required by Section 11.4 and the Adverse Member shall appoint the Second Appraiser within ten (10) Business Days of receiving such notice designating the First Appraiser.

(b) Election to Purchase Units of Adverse Member. For a period ending at 11:59 p.m. (local time at the Company's principal office) on the thirtieth (30th) day following the day

on which notice of the Adverse Member's Net Equity is given pursuant to Section 11.3 (the "Election Period"), each Member who is not an Adverse Member, may elect, by notice to the Adverse Member (the "Purchase Notice"), to purchase, or designate a third party to purchase, all or any portion of the Units of the Adverse Member, which notice shall state the maximum Units that such non-Adverse Member, or such designated third party (in each case, the "Purchasing Member"), is willing to purchase (each a "Purchase Commitment"). If the aggregate Purchase Commitments made by the Purchasing Members are equal to at least one hundred percent (100%) of the Adverse Member's Units, then subject to the following sentence, each Purchasing Member shall be obligated to purchase, and the Adverse Member shall be obligated to sell to such Purchasing Member, that portion of the Adverse Member's Units that corresponds to the ratio of the number of Units of such Purchasing Member to the aggregate number of Units of all Purchasing Members; provided that, if any Purchasing Member's Purchase Commitment was for an amount less than its proportionate share of the Adverse Member's Units as so determined, the portion of the Adverse Member's Units not so committed to be purchased shall be allocated to the other Purchasing Members; and provided further, that each other Purchasing Member shall not be obligated to purchase in excess of the number of Units set forth in the Purchase Commitment delivered by such other Purchasing Member. If the other Members do not elect to purchase the entire Units of the Adverse Member, the Adverse Member shall be under no obligation to sell any portion of its Units to any Member.

(c)   Terms of Purchase; Closing.   Unless the Purchasing Members and the Adverse Member otherwise agree, the closing of the purchase and sale of the Adverse Member's Units shall occur at the principal office of the Company at 10:00 a.m. (local time at the place of the closing) on the first Business Day occurring on or after the thirtieth (30th) day following the last day of the Election Period (subject to Section 11.5). At the closing, the Purchasing Members shall pay to the Adverse Member, by cash or other immediately available funds, the purchase price for the Adverse Member's Units and the Adverse Member shall deliver to the Purchasing Members good title, free and clear of any liens or encumbrances (other than those created by this Agreement) to the Adverse Member's Units thus purchased.

At the closing, the Members shall execute such documents and instruments of conveyance as may be necessary or appropriate to effectuate the transactions contemplated hereby, including the Transfer of the Adverse Member's Units to the Purchasing Members and the assumption by each Purchasing Member of the Adverse Member's obligations with respect to the Adverse Member's Units Transferred to such Purchasing Member. The Company and each Member shall bear its own costs of such Transfer and closing, including attorneys' fees and filing fees. The cost of determining Net Equity shall be borne one-half by the Adverse Member and one-half by the Purchasing Member.

11.3   Net Equity.   The "Net Equity" of a Member's Units, as of any day, shall be the amount that would be distributed to such Member in liquidation of the Company pursuant to Section 12.2 if (i) the Company's business were sold substantially as an entirety for Gross Appraised Value, (ii) the Company paid, or established reserves pursuant to Section 12.2 for the payment of, all Company liabilities and (iii) the Company distributed the remaining proceeds to the Members in liquidation, all as of such day.

The Net Equity of a Member's Units shall be determined, without audit or certification, from the books and records of the Company by the Company's accountants. The Net Equity of a Member's Units shall be determined within thirty (30) days of the day upon which the accountants are apprised in writing of the Gross Appraised Value of the Company's Property, and the amount of such Net Equity shall be disclosed to the Company and each of the Members by written notice ("Net Equity Notice"). The Net Equity determination of the accountants shall be final and binding in the absence of a showing of manifest error.

11.4 Gross Appraised Value. (a) "Gross Appraised Value," as of any day, shall be equal to the fair market value of Company Property as of such day. As used herein, as of any day, "fair market value" of the Property means the price at which a willing seller would sell, and a willing buyer would buy, the Property, free and clear of all liens, security interests or other encumbrances, in an arm's length transaction for cash, without time constraints and without being under any compulsion to buy or sell.

(b) Each provision of this Agreement that requires a determination of Gross Appraised Value also provides the manner and time for the appointment of two (2) appraisers (the "First Appraiser" and the "Second Appraiser"). If the Second Appraiser is not timely designated, the determination of the Gross Appraised Value shall be made by the First Appraiser. The First Appraiser, or each of the First Appraiser and the Second Appraiser if the Second Appraiser is timely designated, shall submit its determination of the Gross Appraised Value to the Company, the Members and the accountants within thirty (30) days of the date of its selection (or the selection of the Second Appraiser, as applicable). If there are two (2) Appraisers and their respective determinations of the Gross Appraised Value vary by less than ten percent (10%) of the higher determination, the Gross Appraised Value shall be the average of the two determinations. If such determinations vary by ten percent (10%) or more of the higher determination, the two Appraisers shall promptly designate a third appraiser (the "Third Appraiser"). Neither the Company nor any Member shall provide, and the First Appraiser and Second Appraiser shall be instructed not to provide, any information to the Third Appraiser as to the determinations of the First Appraiser and the Second Appraiser or otherwise influence such Third Appraiser's determination in any way. The Third Appraiser shall submit its determination of the Gross Appraised Value to the Company, the Members and the accountants within thirty (30) days of the date of its selection. The Gross Appraised Value shall be equal to the average of the two closest of the three determinations, provided that, if the difference between the highest and middle determinations is no more than one hundred and five percent (105%) and no less than ninety-five percent (95%) of the difference between the middle and lowest determinations, then the Gross Appraised Value shall be equal to the middle determination. The determination of the Gross Appraised Value in accordance with the foregoing procedure shall be final and binding on the Company and each Member. If any Appraiser is only able to provide a range in which Gross Appraised Value would exist, the average of the highest and lowest value in such range shall be deemed to be such Appraiser's determination of the Gross Appraised Value of the Company's Property. Each Appraiser selected pursuant to the provisions of this Section shall be a qualified Person with prior experience in appraising businesses comparable to the Business of the Company and that is not an interested person with respect to any Member.

11.5 Extension of Time.  If any Transfer of a Member's Units in accordance with this Section 11 or Section 10 requires the consent, approval, waiver, or authorization of any governmental authority or of the stockholders of a Member or any of its Affiliates as a condition to the lawful and valid Transfer of such Member's Units to the proposed transferee thereof, then each of the time periods provided in this Section 11 or Section 10, as applicable, for the closing of such Transfer shall be suspended for the period of time during which any such consent, approval, waiver, or authorization is being diligently pursued; provided, however, that in no event shall the suspension of any time period pursuant to this Section 11.5 extend for more than three hundred sixty-five (365) days other than in the case of a purchase of an Adverse Member's Units.  Each Member agrees to use its diligent efforts to obtain, or to assist the affected Member or the Management Committee in obtaining, any such consent, approval, waiver, or authorization and shall cooperate and use its diligent efforts to respond as promptly as practicable to all inquiries received by it, by the affected Member or by the Management Committee from any governmental authority for initial or additional information or documentation in connection therewith.

## SECTION 12 - DISSOLUTION AND WINDING UP

12.1 Dissolution Events.  (a)  Dissolution.  The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

(i)  The unanimous vote of the Members to dissolve, wind up, and liquidate the Company;

(ii)  A judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Business; or

(iii)  The Bankruptcy, dissolution, retirement, resignation or expulsion of any Member; provided, that any such event will not be deemed a Dissolution Event in the event that there are at least two remaining Members and each remaining Member agrees to continue the business of the Company within ninety (90) days after the occurrence of such an event.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

(b)  Reconstitution.  If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the "Reconstitution Period"), all of the Members may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Agreement by forming a new limited liability company on terms identical to those set forth in this Agreement.  Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 12.2 hereof.  If such an election is made within the Reconstitution Period, then:

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

(i)   The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in this Section 12.1(a);

(ii)   Unless otherwise agreed to by a majority of the Members, the Certificate and this Agreement shall automatically constitute the Certificate and Agreement of such new Company.  All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company.  No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; provided that the right of the Members to select successor managers and to reconstitute and continue the Business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

12.2  Winding Up.   Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 12.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided that all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 12.2 and the Certificate has been canceled pursuant to the Act.  The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 12.1(b) hereof.  The Liquidator shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 12.9 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(a)   First, to creditors (including Members and Managers who are creditors, to the extent otherwise permitted by law) in satisfaction of all of the Company's Debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to members under Section 18-601 or 18-604 of the Act;

(b)   Second, except as provided in this Agreement, to members and former Members of the Company in satisfaction of liabilities for distribution under Sections 18-601 or 18-604 of the Act; and

(c)   The balance, if any, to the Members in accordance with the positive balance in their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods.

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 12.

12.3 Compliance with Certain Requirements of Regulations; Deficit Capital Accounts. In the event the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), (a) distributions shall be made pursuant to this Section 12 to the Members who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all Allocation Years, including the Allocation Year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Section 12 may be:

(a) Distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 12.2 hereof; or

(b) Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

12.4 Deemed Distribution and Re-Contribution. Notwithstanding any other provision of this Section 12, in the event the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) but no Dissolution Event has occurred, the Property shall not be liquidated, the Company's Debts and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the Property in-kind to the Members, who shall be deemed to have taken subject to all Debts of the Company and other liabilities all in accordance with their respective Capital Accounts. Immediately thereafter, the Members shall be deemed to have recontributed the Property in-kind to the Company, which shall be deemed to have taken subject to all such liabilities.

12.5 Rights of Members. Except as otherwise provided in this Agreement, each Member shall look solely to the Property of the Company for the return of its Capital Contribution and has no right or power to demand or receive Property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or Manager.

12.6 Notice of Dissolution/Termination. (a) In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 12.1, result in a dissolution of the Company, the Management Committee shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Management Committee) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Management Committee).

(b)  Upon completion of the distribution of the Company's Property as provided in this Section 12, the Company shall be terminated, and the Liquidator shall cause the filing of the Certificate of Cancellation pursuant to Section 18-203 of the Act and shall take all such other actions as may be necessary to terminate the Company.

12.7 Allocations During Period of Liquidation. During the period commencing on the first day of the Fiscal Year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Members pursuant to Section 12.2 hereof (the "Liquidation Period"), the Members shall continue to share Profits, Losses, gain, loss and other items of Company income, gain, loss or deduction in the manner provided in Section 3 hereof.

12.8 Character of Liquidating Distributions. All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

12.9 The Liquidator. (a) Definition. The "Liquidator" shall mean a Person appointed by the Management Committee to oversee the liquidation of the Company.

(b) Fees. The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Section 12 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c) Indemnification. The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

12.10  Form of Liquidating Distributions. For purposes of making distributions required by Section 12.2 hereof, the Liquidator may determine whether to distribute all or any portion of

the Property in-kind or to sell all or any portion of the Property and distribute the proceeds therefrom.

## SECTION 13 - POWER OF ATTORNEY

13.1 Managers as Attorneys-In-Fact. Each Member hereby makes, constitutes, and appoints each Manager, severally, with full power of substitution and resubstitution, its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file, publish and record (i) all certificates of formation, amended name or similar certificates, and other certificates and instruments (including counterparts of this Agreement) which the Management Committee may deem necessary to be filed by the Company under the laws of the State of Florida or any other jurisdiction in which the Company is doing or intends to do business; (ii) any and all amendments, restatements or changes to this Agreement and the instruments described in clause (i), as now or hereafter amended, which the Management Committee may deem necessary to effect a change or modification of the Company in accordance with the terms of this Agreement, including, without limitation, amendments, restatements or changes to reflect (A) any amendments adopted by the Members in accordance with the terms of this Agreement, (B) the admission of any substituted Member and (C) the disposition by any Member of its interest in the Company; (iii) all certificates of cancellation and other instruments which the Management Committee deems necessary or appropriate to effect the dissolution and termination of the Company pursuant to the terms of this Agreement and (iv) any other instrument which is now or may hereafter be required by law to be filed on behalf of the Company or is deemed necessary by the Management Committee to carry out fully the provisions of this Agreement in accordance with its terms. Each Member authorizes each such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Member might or could do personally, and hereby ratify and confirm all that any such attorney-in-fact shall lawfully do, or cause to be done, by virtue thereof or hereof.

13.2 Nature of Special Power. The power of attorney granted to each Manager pursuant to this Section 13:

(a) Is a special power of attorney coupled with an interest and is irrevocable;

(b) May be exercised by any such attorney-in-fact by listing the Members executing any agreement, certificate, instrument, or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Members; and

(c) Shall survive and not be affected by the subsequent Bankruptcy, insolvency, dissolution, or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of its interest in the Company (except that where the assignment is of such Member's entire interest in the Company and the assignee, with the consent of the other Members, is admitted as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling any such

attorney-in-fact to effect such substitution) and shall extend to such Member's, or assignee's successors and assigns.

## SECTION 14 - MISCELLANEOUS

14.1 Notices. Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an officer of the Person to whom the same is directed, or (ii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, or by facsimile, if such facsimile is followed by a hard copy of the facsimile communication sent promptly thereafter by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members and Managers:

(a) If to the Company, to the address determined pursuant to Section 1.4 hereof;

(b) If to the Managers, to the address of the Company;

(c) If to a Member, to the address set forth in Section 2.1 hereof, and if not so denoted therein, then to the address of the company.

14.2 Binding Effect. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective successors, transferees, and assigns.

14.3 Construction. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

14.4 Time. In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

14.5 Headings. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

14.6 Severability. Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section 14.6 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

14.7 Incorporation by Reference. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is not incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

14.8 Variation of Terms. All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

14.9 Governing Law. The laws of the State of Florida shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder.

14.10 Waiver of Jury Trial. Each of the Members irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Agreement.

14.11 Counterpart Execution. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

14.12 Specific Performance. Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

**[SIGNATURES TO FOLLOW ON THE NEXT PAGE]**

OPERATING AGREEMENT OF CHEEKIE INVESTMENTS, LLC, a Florida limited liability company

26.     Pagliery's removal of such property has deprived the Law Firm of its property permanently or for an indefinite period of time.

27.     Pagliery's acts were committed with a conscious disregard of the rights of the Law Firm, and with the wilful and wanton intent to deprive the Law Firm of its property.

28.     The Law Firm has made demand for the return of its property, but Pagliery has failed and refused to do so.

29.     As a result of Pagliery's acts, the Law Firm has suffered damages and suffered the loss of the use and benefit of the monies and property converted by Pagliery.

WHEREFORE the Law Firm demands judgment for damages against Pagliery plus interest, costs, and any other relief the Court deems equitable and just.

## COUNT III
### Breach of Duty of Loyalty and Good Faith

30.     The Law Firm re-alleges the allegations in paragraphs one through fourteen.

31.     As the Law Firm's employee, Pagliery owed the Law Firm a duty of loyalty and good faith.

32.     Pagliery breached his duties of loyalty and good faith by making himself manager and, without authorization, sole owner of Grand Prix, while all expenses of Grand Prix were paid by the Law Firm.

33.     Pagliery further breached his duties of good faith and loyalty by, without authorization, appropriating funds, records and accounts of Grand Prix, client files belonging to the Law Firm, and other property belonging to either the Law Firm or Grand Prix.

34.     As a result of Pagliery's actions the Law Firm has suffered damages.

WHEREFORE Plaintiff demands judgment for damages against Pagliery plus interest, costs, and any other relief the Court deems equitable and just.

## COUNT IV
### For Restoration of Converted Assets and Appointment of Receiver

35.     The Law Firm re-alleges the allegations in paragraphs one through fourteen.

36.     This is an action to set aside a transfer of corporate assets from Grand Prix and to appoint a receiver for the corporation.

37.     At all times mentioned, Pagliery was the member manager of Grand Prix.

38.     The Law Firm has a claim as a member of Grand Prix.

39.     In January, 2005, following a demand by the Law Firm to issue certificates to the Law Firm evidencing its ownership of Grand Prix, Pagliery made a distribution of $99,700.00 either to himself or to another entity solely controlled by him.

40.     The distribution was a violation of law, the articles of organization and operating agreement of Grand Prix, and a breach of the trust reposed in Pagliery by the Law Firm.

41.     The distribution was made to divest Grand Prix of assets, and to transfer the assets to Pagliery to carry on business under another name, for the purpose of rendering the Law Firm's interest in Grand Prix valueless.

WHEREFORE the Law Firm requests the Court as follows:

a.     That the distribution made by Grand Prix to Pagliery and/or to an entity controlled by him, be set aside.

b.     That a receiver of the property of Grand Prix be appointed.

c.     That Pagliery be directed to turn over to the receiver the property of Grand Prix, or account for its full value, and that the receiver hold this property or its money equivalent to the benefit of Grand Prix and its owners and creditors.

d.     That the Law Firm be awarded reasonable expenses for maintaining this action, including reasonable attorney's fees and costs.

e.      That this Court grant the Law Firm such further and other relief the Court deems equitable and just.

## COUNT V
### Money Lent

Pleading in the alternative, the Law Firm states:

42.      The Law Firm re-alleges the allegations in paragraphs one through seven.

43.      Pagliery filed the documents required to set up Grand Prix and named himself as manager of Grand Prix. Pagliery further issued shares in Grand Prix naming himself as the owner.

44.      Pagliery requested that the Law Firm pay the costs of setting up Grand Prix and of operating the same on a day-to-day basis, including the rental of office space and payment of its employees.

45.      The Law Firm provided all the funds to set up and operate Grand Prix pursuant to Pagliery's request.

46.      Pagliery and Grand Prix promised to repay the Law Firm for the funds advanced, but have failed and refused to do so, despite the Law Firm's demand.

47.      Pagliery and Grand Prix owe Plaintiff sums in excess of this Court's minimum jurisdictional amount together with interest due on the money lent to Pagliery and/or Grand Prix by Plaintiff between August of 2003 and January of 2005.

WHEREFORE the Law Firm demands judgment for damages against Pagliery and Grand Prix plus interest, costs, and any other relief the Court deems equitable and just.

## COUNT VI
### Unjust Enrichment

48.      The Law Firm re-alleges the allegations in paragraphs forty-two through forty-seven.